Ghaith R. PHARAON, Petitioner,

v.

**BOARD OF GOVERNORS OF
THE FEDERAL RESERVE
SYSTEM, Respondent.**

No. 97–1114.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 8, 1997.

Decided Feb. 10, 1998.

As Amended April 17, 1998.

Richard F. Lawler, Greenwich, CT, argued the cause for petitioner. With him on the briefs were Philip M. Smith and John C. Canoni, New York City.

Stephen H. Meyer, Senior Attorney, Board of Governors of the Federal Reserve System, argued the cause for respondent. With him on the brief were James V. Mattingly, Jr., DC, General Counsel, Richard M. Ashton, DC, Associate General Counsel, and Katherine H. Wheatley, Assistant General Counsel. Douglas B. Jordan, Senior Counsel, entered an appearance.

Before: GINSBURG, HENDERSON and TATEL, Circuit Judges.

Opinion for the Court by Circuit Judge TATEL.

TATEL, Circuit Judge:

Petitioner challenges the conclusion of the Board of Governors of the Federal Reserve System that he participated in violations of the Bank Holding Company Act by the Bank of Credit and Commerce International. He also challenges the Board's decision to fine him thirty-seven million dollars and bar him permanently from the U.S. banking industry.

Because substantial evidence supports the Board's findings of fact and because petitioner's challenges to the Board's procedures, conclusions of law, and choice of sanctions lack merit, we affirm.

I

Section 3(a) of the Bank Holding Company Act makes it unlawful for a company to become a bank holding company without approval of the Board of Governors. 12 U.S.C. § 1842(a)(1)(1994). In a September 1991 Notice of Assessment, the Board charged petitioner Ghaith R. Pharaon, a prominent Saudi Arabian businessman and major shareholder in the Bank of Credit and Commerce International ("BCCI"), with participating in a scheme through which BCCI, using Pharaon as an undisclosed "nominee" or front, secretly acquired control of Independence Bank, a medium-sized California lender, in violation of section 3(a) of the Act. According to the Board, the scheme was intended to solve two problems BCCI faced in the mid–1980's: accumulated losses of over a billion dollars and pressure from Luxembourg, BCCI's nominal home country, to find a new country capable of regulating an institution operating in nearly seventy nations. Ownership of Independence would solve the first problem by generating profits for BCCI and the second by laying the groundwork for transferring BCCI's oversight to U.S. banking agencies. Pharaon's participation in the scheme, the Board asserted, allowed BCCI to mask its control of Independence from federal regulators, preventing them from obtaining an accurate view of Independence's true management and resources. The Board charged that from 1985, when BCCI secretly purchased Independence, until 1991, when bank regulators from several countries seized BCCI, BCCI controlled Independence, infusing capital into the bank, approving selection of its directors, and actively participating in its management.

In addition to charging Pharaon with participating in BCCI's section 3(a) violation, the Notice of Assessment charged that during the period BCCI secretly controlled Independence, the annual reports (known as Y–7s) that BCCI was required to submit to the Board as a foreign bank with U.S. branches, *see id.* § 3106(a), concealed its control of the bank in violation of section 5(c) of the Act, *id.* § 1844(c), and its implementing regulation, Regulation Y, 12 C.F.R. § 225.5 (1997). The Notice held Pharaon responsible for BCCI's violations under the Act's individual liability provision, section 8(b), 12 U.S.C. § 1847(b), and proposed a thirty-seven million dollar civil penalty. Considering Pharaon "institutional[ly]-affiliated" with BCCI under 12 U.S.C. § 1813(u), the Notice also sought an order of prohibition pursuant to section 8(e) of the Federal Deposit Insurance Act, *id.* § 1818(e)(1), permanently barring him from participating in the affairs of any federally insured depository.

Shortly after the Board issued its Notice, a federal grand jury sitting in Washington, D.C., indicted Pharaon for criminal offenses relating to BCCI's purchase of Independence. The following year, another federal grand jury, this one sitting in Miami, Florida, and a state grand jury in New York, each indicted Pharaon in connection with his larger involvement with BCCI. Bench warrants for Pharaon's arrest were issued in connection with the Washington and Miami indictments. Pharaon responded to neither.

In the meantime, from his home in Saudi Arabia and acting through U.S. counsel, Pharaon answered the Board's Notice of Assessment, denying all charges and requesting a hearing. Citing Pharaon's decision to remain beyond the reach of federal prosecutors and relying on fugitive disentitlement, a doctrine allowing courts to sanction parties where their fugitive status has "some connection" to the proceeding, *Daccarett–Ghia v. Commissioner,* 70 F.3d 621, 624 (D.C.Cir.1995), the Administrative Law Judge recommended ruling summarily for the Board. In a 1994 decision, the Board declined to adopt the ALJ's recommendation, rejecting the use of fugitive disentitlement because Pharaon's physical presence was unnecessary to a hearing, because the Board had no responsibility to vindicate any affront to the courts that had indicted Pharaon, and because any judgment against Pharaon could be satisfied from his frozen assets. The Board made clear, however, that on remand

the ALJ could use his "express and implicit procedural powers" to ensure that Pharaon's fugitive status not disrupt the proceedings.

Following a nineteen-day hearing, the ALJ issued a recommended decision finding in favor of the Board and approving the penalties sought in the Notice of Assessment. Filing 179 pages of exceptions challenging virtually all of the ALJ's findings of fact and conclusions of law, Pharaon appealed to the Board. Board enforcement counsel also appealed, arguing that the ALJ should have imposed the maximum statutory penalty of $111.5 million (calculated by totaling the days each violation had been outstanding at the time the Board issued the Notice—8299 days—and assessing a penalty of $1000 for each day prior to August 10, 1989, when Congress amended the Act to increase its penalties, and $25,000 per day thereafter, *see* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, § 907(j)(2), 103 Stat. 183, 475 (1989) ("FIRREA") (codified at 12 U.S.C. § 1847(b)(1))). The Board adopted the ALJ's recommended decision.

Pharaon now petitions for review. Applying the standards set forth in the Administrative Procedure Act, *see* 12 U.S.C. §§ 1818(h), 1847(b)(3) (APA applies to penalty assessment hearings under the Bank Holding Company Act), we will set aside the Board's factual findings only if unsupported by substantial evidence on the record as a whole, 5 U.S.C. § 706(2)(E) (1994); we will set aside the Board's legal conclusions only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A).

## II

■ We begin with Pharaon's challenges to the Board's finding that BCCI violated the Bank Holding Company Act. The Act makes it "unlawful, except with the prior approval of the Board, ... for any action to be taken that causes any company to become a bank holding company." 12 U.S.C. § 1842(a). A company becomes a bank holding company if, among other things, "(A) the company directly or indirectly ... owns, controls, or has power to vote 25 per centum or more of any class of voting securities of the bank or company; [or] (B) the company controls in any manner the election of a majority of the directors or trustees of the bank or company." *Id.* § 1841(a)(2)(A)-(B). The Act provides for bank holding companies to file periodic reports with the Board to facilitate Board oversight. *Id.* § 1844(c); 12 C.F.R. § 225.5. Finding that BCCI controlled more than twenty-five percent of Independence's voting stock, as well as the election of a majority of its directors, the Board concluded that BCCI had become a holding company within the meaning of both subsections (A) and (B) and that it concealed its unlawful control by filing Y–7s that flatly denied controlling any U.S. banks.

For its subsection (A) finding, the Board relied primarily on a May 17, 1985, agreement between Pharaon and the International Credit and Investment Company (Overseas) Ltd. ("ICIC"), a BCCI-controlled company. Titled "Acquisition of Shares of Independence Bank," and signed by Pharaon and Swaleh Naqvi, BCCI's then-second-in-command, the agreement provides in relevant part as follows:

1. [Pharaon and ICIC] have agreed to acquire 100% of shares capital of the Bank (the said shares) from the present shareholders thereof. . . .

2. All the said shares of the Bank on their purchase as aforesaid shall be transferred to and held in the name of [Pharaon] but only 15% of the said shares of the Bank will be held by [Pharaon] as beneficial owner thereof.

3. For the balance of 85% of the said shares of the Bank, ICIC shall have the right to purchase them at their cost price from [Pharaon] either in its own name or in the name or names of its nominee or nominees and, till [sic] such purchase is effected and the shares transferred to the name of ICIC and/or its nominee or nominees, [Pharaon] will hold them in a fiduciary capacity for ICIC.

4. ICIC will provide funds to, or otherwise procure a loan for [Pharaon] of the cost of 85% of the said shares of the

Bank and in consideration of the premises mentioned in 3 above, ICIC will itself pay or discharge all interest, costs, charges, commission and/or expenses of and incidental to the said loan and repayment thereof and hold [Pharaon] indemnified and harmless in respect thereof.

The agreement also entitled ICIC to dividends issued on its shares, gave ICIC the right to possess Independence's share certificates, and prohibited Pharaon from disposing of ICIC's shares.

Relying on the "right to purchase" language in paragraph three, Pharaon argues that the agreement merely gave ICIC an option to purchase, vesting it with no actual control. The Board rejected this argument, as do we. The agreement plainly states that Pharaon will hold only fifteen percent of Independence beneficially (paragraph two), and that ICIC will fund Pharaon's purchase of the remaining eighty-five percent (paragraph four). Not only does paragraph three itself specifically provide that Pharaon "will hold" the eighty-five percent "in a fiduciary capacity for ICIC," but Naqvi testified that the "right to purchase" language simply clarified BCCI's right to become nominal as well as beneficial owner of the shares.

Pharaon also claims that the parties neither effectuated nor followed the agreement, but the record contains substantial evidence to support the Board's contrary finding. The Board pointed to evidence that BCCI provided over $10 million of Independence's $23 million initial purchase price, that BCCI issued a $5 million guarantee to support a $12.6 million loan Pharaon obtained from the Bank of Boston for the remaining amount of the purchase, and that BCCI later refinanced the Bank of Boston loan, taking physical possession of Pharaon's Independence stock certificates in accordance with the agreement. Additional evidence that the parties implemented the agreement comes from a June 1986 meeting at which Pharaon proposed to Naqvi and Agha Hasan Abedi, then-head of BCCI, to increase his share of Independence from fifteen percent to fifty percent. Subsequently changing his mind, Pharaon sent Naqvi a handwritten note stating that "I would suggest that for the time being the 15/85 arrangement be maintained until we can determine the course we want Independence to take."

Pharaon's other arguments provide no basis for overturning the Board's subparagraph (A) finding. Although he claims that BCCI's financing of Pharaon's purchase of Independence cannot by itself support a finding of control under the Act, the Board's determination that BCCI controlled Independence rested not just on BCCI's financial support, but also on the entire record, including the plain language of the 1985 agreement, the 1986 meeting with Abedi and Naqvi, and Pharaon's follow-up note. Pharaon points to evidence in the record that he too helped manage Independence and contributed to its capital requirements. Because we must consider the entire record before us, however, such evidence in no way undermines the Board's conclusion that BCCI, not Pharaon, controlled Independence. Pharaon claims that the ALJ improperly relied on allegations that he acted as a nominee for BCCI in transactions not at issue in the Independence proceeding. At the beginning of his recommended decision, however, the ALJ made quite clear that he considered such matters only for background and to demonstrate Pharaon's financial condition, not to prove the violations relating to Independence.

■ While we can uphold the Board's conclusion that BCCI controlled Independence solely on the basis of its subsection (A) finding, we note that the record also contains substantial evidence to support the Board's subsection (B) finding that BCCI controlled the election of at least three members of Independence's five-member board of directors. Abedi selected Kemal Shoaib to serve as Independence's CEO and chairman, Shoaib received pension and other fringe benefits from BCCI, and Shoaib remained in active contact with BCCI while at Independence. A Shoaib letter to Naqvi states that another director, a Morrison & Foerster partner, was "nominated by us." When a third board position opened, Shoaib wrote to Naqvi seeking approval for two potential candidates. Although Pharaon points to some genuine inconsistencies in other ALJ findings

about BCCI's involvement in the selection of Independence personnel, the Board's finding that BCCI controlled a majority of the Independence board finds firm support in the record.

■ Challenging the Board's interpretation of the Act's penalty provisions, Pharaon argues that regardless of BCCI's violations, he cannot be penalized for acting as BCCI's undisclosed nominee. The Board found Pharaon personally liable under section 8(b) of the Act, which authorizes the Board to levy civil penalties against "[a]ny company which violates, and any individual who participates in a violation of, any provision of this chapter, or any regulation or order issued pursuant thereto." 12 U.S.C. § 1847(b)(1). Comprehensively overhauling the regulation of financial institutions in 1989, Congress added a new subsection 1847(d), which provides three tiers of penalties for "any company" that commits a reporting violation. FIRREA § 911(e), 103 Stat. at 481 (codified at 12 U.S.C. § 1847(d)). According to Pharaon, because subsection (d) mentions only companies, individuals are no longer liable for reporting violations under subsection (b). Although the Board responds that repeals by implication are disfavored, we need not invoke that familiar canon of statutory interpretation because we cannot even discern a basis for implying a repeal. Establishing a range of penalties for reporting violations by *companies*, FIRREA has no bearing on section 1847(b)'s long-standing and still-existing provision for *individual* liability other than to increase maximum penalties from $1000 to $25,000 per day. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter ...."). Congress passed FIRREA to strengthen "the enforcement powers of Federal regulators of depository institutions" and "the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions and their depositors." FIRREA § 101(9), (10), 103 Stat. at 187. We cannot imagine that Congress would have exempted individuals from liability for false reports without saying so.

■ We are equally unpersuaded by Pharaon's argument that the Board lacked evidence to connect him to BCCI's scheme. Sweeping broadly, section 1847(b) reaches any action "causing, bringing about, participating in, counseling, or aiding or abetting" a violation of the Act. 12 U.S.C. § 1847(b)(5). Nothing in the Act requires that Pharaon have known the details of BCCI's plan to conceal its ownership of Independence. *Interamericas Invs., Ltd. v. Board of Governors of the Fed. Reserve Sys.,* 111 F.3d 376, 384 (5th Cir.1997). It is enough, as the Board found, that Pharaon agreed to act as BCCI's nominee. As BCCI's nominee, he could be held responsible for acts undertaken by BCCI to further its secret purchase of Independence, such as filing false reports with U.S. regulators.

### III

■ Having thus upheld the Board's twin findings that BCCI violated the Act by secretly acquiring Independence and that Pharaon, serving as the scheme's lynchpin, is personally liable as a participant, we turn to Pharaon's procedural challenges. He claims principally that the ALJ improperly denied him discovery and excluded testimony by misapplying the fugitive disentitlement doctrine.

As we read the record, the ALJ mentioned Pharaon's absence as a consideration in connection with just one ruling Pharaon challenges: a July 1995 decision allowing only live testimony at the hearing. Pharaon treats this ruling as a form of fugitive disentitlement. We think the Board offers a more accurate interpretation: The ALJ did not punish Pharaon for his fugitive status, but merely relied on what the Board referred to in its 1994 decision as his "express and implicit procedural powers" to ensure that Pharaon's fugitive status not adversely affect the hearing. Later making this point explicit, the ALJ explained that "the importance of visual observations of witnesses" significantly influenced his ruling requiring Pharaon to appear in person. Given the significance of personal observation to credibility determinations, we cannot say that this ruling amounted to an abuse of discretion. We reach the

same conclusion with respect to another ruling, also challenged by Pharaon, in which the ALJ "similarly order[ed]" that a witness Pharaon proposed on the eve of the hearing could only appear in person.

Citing fugitive disentitlement, Pharaon challenges several other discovery rulings. *See* Pet'r Br. at 53 ("Pharaon was thus denied the basic rudiments of due process, apparently based on the disentitlement doctrine."). Because none of the rulings rested on fugitive disentitlement, however, we need not consider them further.

■ Pharaon also claims that the Board failed to disclose 127 unspecified files of relevant documents and an agreement with the New York District Attorneys' Office immunizing Naqvi for his testimony. Offering no grounds to support these challenges, Pharaon has waived them. *Terry v. Reno*, 101 F.3d 1412, 1415 (D.C.Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997).

■ Next, Pharaon claims ALJ bias, relying chiefly on a statement made by the ALJ in his 1993 ruling on fugitive disentitlement. Claims of bias must "be raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist." *Marcus v. Director, Office of Workers' Compensation Programs*, 548 F.2d 1044, 1051 (D.C.Cir.1976) (footnote omitted). Aware of the ALJ's alleged bias when he appealed the recommended decision to the Board, Pharaon failed to raise the issue or argue that the case should be remanded to a different ALJ. He has thus waived his principal ground for asserting bias. Other evidence of alleged bias—the ALJ's record of ruling in favor of the Board in other proceedings and his allegedly incorrect rulings against Pharaon in this case—falls far short of demonstrating that the ALJ had "a fixed opinion—'a closed mind on the merits of the case.'" *Throckmorton v. NTSB*, 963 F.2d 441, 445 (D.C.Cir.1992) (quoting *United States v. Haldeman*, 559 F.2d 31, 136 (D.C.Cir.1976)). "Almost invariably, [such rulings] are proper grounds for appeal, not for recusal." *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994).

■ Pharaon's final procedural challenge, presented only in a sparse footnote, invokes 5 U.S.C. § 557(c), which states that "[b]efore ... a decision on agency review of the decision of subordinate employees, the parties are entitled to a reasonable opportunity to submit ... exceptions to the ... recommended decision[ ] ... [and][t]he record shall show the ruling on each ... exception presented." Pharaon faults the Board for failing to respond with specificity to each of his many exceptions to the ALJ's recommended decision. Section 557(c) functions as a bedrock of judicial review of agency action. We have long held, however, that agencies need only indicate that they have considered and rejected a party's exceptions, *see Human Dev. Ass'n v. NLRB*, 937 F.2d 657, 668 (D.C.Cir.1991), and that they have no obligation to respond at all to entirely insubstantial arguments, *International Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB*, 792 F.2d 241, 247–48 (D.C.Cir.1986). "Assum[ing]" Pharaon to be challenging the ALJ's recommended decision "in its entirety," the Board said that it had reviewed Pharaon's submission and denied his exceptions. From our own review of the Board's decision and Pharaon's exceptions, we are satisfied that the agency in fact considered and rejected all of them. To be sure about this, at oral argument we asked Pharaon's counsel to identify any significant exceptions to which the Board failed to respond. He offered none.

## IV

■ This brings us finally to Pharaon's statutory and constitutional challenges to the penalties. In keeping with our limited review of agency penalty assessments, we will not overturn the Board's choice of sanctions unless they are either "'unwarranted in law or ... without justification in fact.'" *Bluestone Energy Design, Inc. v. FERC*, 74 F.3d 1288, 1294 (D.C.Cir.1996) (quoting *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1457–58, 36 L.Ed.2d 142 (1973)) (ellipsis in original).

■ Citing the difference between his thirty-seven million dollar penalty and the

range of penalties set out in a Board Civil Money Penalty Assessment Matrix and claiming the Board failed to follow a thirteen-factor test set forth in an Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Institutions Regulatory Agencies, 45 Fed.Reg. 59,-423, 59,424–25 (1980), Pharaon urges us to set aside the penalty as arbitrary and capricious in violation of the APA. According to the Board, neither the matrix nor the interagency policy limits its discretion.

We agree with the Board about the matrix. An internal, staff-level guideline, the matrix cautions that "because the facts and circumstances of each penalty case are different, the assessment of a civil money fine cannot be completely reduced to the mechanical application of a formula or purely numerical index. The exercise of judgment based on expertise and experience is important and necessary." Because the matrix does not constrain the Board's discretion, the agency had no obligation to explain any departure from it. *See, e.g., Vietnam Veterans of Am. v. Secretary of the Navy*, 843 F.2d 528, 539 (D.C.Cir.1988) (where no indication that agency intended to bind itself by staff memorandum, document not binding).

■■ In contrast to the matrix, the Board has expressly adopted the interagency policy. *See In re Cedar Vale Bank Holding Co.*, 82 Fed. Res. Bull. 871 (1996), *aff'd sub. nom. Long v. Board of Governors of the Fed. Reserve Sys.*, 117 F.3d 1145 (10th Cir.1997). Considering the factors listed in the interagency policy, the ALJ concluded that Pharaon's violations would yield a penalty of slightly over $151 million, well above the statutory maximum. Although the Board's January 1997 final decision does not review each factor in turn, a comparison of the Board's decision with the interagency policy indicates that the Board in fact considered each factor relevant to this case. When we asked Pharaon's counsel about this at oral argument, he was unable to point to any relevant factor the Board ignored.

■■ Pharaon correctly observes that the Board nowhere tells us how its enforcement counsel originally selected thirty-seven million dollars. But we will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); *see also Detroit/Wayne County Port Auth. v. ICC*, 59 F.3d 1314, 1317 (D.C.Cir.1995). This is just such a case. After weighing the mitigating factors set forth in 12 U.S.C. § 1818(i)(2)(G)(i)-(iv)—"(i) the size of financial resources and good faith of the ... person charged; (ii) the gravity of the violation; (iii) the history of previous violations; and (iv) such other matters as justice may require"—the Board found the penalty "in line with the gravity of the offenses, the intentional nature of the actions, [and] the attempts to conceal the nature of the transactions." Under all of these circumstances, we find nothing arbitrary and capricious in the Board's selection of the penalty. Indeed, had the Board applied the penalty standards set forth in 12 U.S.C. § 1847(b), as Board enforcement counsel urged, it could have imposed a penalty of over $111 million, three times the amount it actually assessed. Although Pharaon challenged the calculation of this maximum penalty before the Board, he does not do so here.

■■ Pharaon's principal constitutional challenge to the thirty-seven million dollar penalty rests on the Eighth Amendment's Excessive Fines Clause, U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."). Protecting individuals against government power to extract payments as punishment, *Austin v. United States*, 509 U.S. 602, 609–10, 113 S.Ct. 2801, 2805–06, 125 L.Ed.2d 488 (1993), the Excessive Fines Clause requires us to consider the " 'value of the fine in relation to the offense.' " *United States v. Emerson*, 107 F.3d 77, 80 (1st Cir.) (quoting *Austin*, 509 U.S. at 627, 113 S.Ct. at 2814–15 (Scalia,

J., concurring)), *cert. denied,* — U.S. —, 118 S.Ct. 61, 139 L.Ed.2d 24 (1997). Reviewing the question *de novo, see Lamprecht v. FCC,* 958 F.2d 382, 391 (D.C.Cir.1992), we discern no Eighth Amendment violation. As we have already indicated in rejecting Pharaon's APA challenge, the penalty is proportional to his violation and well below the statutory maximum.

■ Pharaon's Fifth Amendment claim has even less merit. He relies on the Supreme Court's statement in *BMW of North Am. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." *Id.* at 574, 116 S.Ct. at 1598. Here, section 1847(b)'s maximum penalty provisions provided just that notice. Because the assessed penalty falls far below the statutory maximum, Pharaon cannot claim that he lacked constitutionally adequate notice. *Cf. Long,* 117 F.3d at 1156 (upholding a $717,941 penalty against due process challenge when statute authorized Board to assess a maximum penalty of $45.6 million). We need not consider Pharaon's Double Jeopardy claim because he failed to include it in his exceptions to the ALJ's recommended decision. *See* 12 C.F.R. § 263.39(b)(1) (1997) (failure to raise exception constitutes waiver).

■ For his final argument, Pharaon claims that the Board had no basis under 12 U.S.C. § 1818(e)(1)(A)-(C) for its order permanently barring him from participating in the affairs of any federally insured depository. He offers no challenge to the Board's subsections (A) and (C) findings, and for good reason: It is undeniable that he "violated [the] law," *id.* § 1818(e)(1)(A)(i), and that his violation at least "involve[d] personal dishonesty," *id.* § 1818(e)(1)(C). Pharaon claims only that the record contains insufficient evidence to support the Board's finding under subsection (B), the so-called effects prong, *see Oberstar v. FDIC,* 987 F.2d 494, 502 (8th Cir.1993), which requires that the Board establish that:

by reason of the violation ... (i) such insured depository institution or business institution has suffered or will probably suffer financial loss or other damage; (ii) the interests of the insured depository institution's depositors have been or could be prejudiced; or (iii) such party has received financial gain or other benefit by reason of such violation, practice, or breach.

12 U.S.C. § 1818(e)(1)(B).

According to Pharaon, subsection (B) requires the Board to demonstrate the exact amount of harm caused by Pharaon's participation in BCCI's scheme. The plain language of the statute provides to the contrary, however. Section 1818(e)(1)(B) allows the Board to impose an order of prohibition not only if the insured institution "suffered ... financial loss or other damage" or if the interests of its depositors "have been ... prejudiced," but also if the institution "will probably suffer financial loss or other damage" or if its depositors "could be prejudiced." *Id.* Under all the circumstances of this case, we think the Board had ample basis for concluding that as a result of BCCI's secret takeover of Independence and Pharaon's participation in the scheme, BCCI "will probably suffer financial loss or other damage" and its depositors "could be prejudiced."

## V

Because the Board's findings of fact are supported by substantial evidence in the record and because we discern no reversible errors in the Board's procedures, legal conclusions, or choice of sanctions, we affirm.

*So ordered.*