BCCI HOLDINGS (LUXEMBOURG),
SOCIETE ANONYME, et al.,
Plaintiffs,

v.

Ghaith R. PHARAON, Defendant.

No. 94 Civ. 3058(SHS).

United States District Court,
S.D. New York.

March 19, 1999.

Eric L. Lewis, Nussbaum & Wald, Washington, DC, for plaintiffs.

John M. Newell, Richard F. Lawler (Philip M. Smith, Melissa Z. Neier, on the brief), Whitman Breed Abbott & Morgan, New York City, for defendant.

## OPINION AND ORDER

STEIN, District Judge.

Plaintiffs BCCI Holdings (Luxembourg) Societe Anonyme ("BCCI Holdings"), Bank of Credit and Commerce International Societe Anonyme ("BCCI S.A."), Bank of Credit and Commerce International (Overseas) Limited ("BCCI Overseas"), and International Credit and Investment Company (Overseas) Limited ("ICIC Overseas") (collectively, the "BCCI Group"), brought this action against defendant Ghaith R. Pharaon, a Saudi Arabian businessman and major shareholder in the BCCI Group, asserting claims for (1) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, (2) common law fraud, and (3) collection on a personal guaranty executed by defendant in favor of BCCI Overseas.

Defendant has moved pursuant to Fed. R.Civ.P. 12(c) for judgment on the pleadings dismissing the complaint. Plaintiffs have moved for partial summary judgment on the RICO claims (Counts I to IV of the complaint) by reason of estoppel, based on the alleged preclusive effect of the final decision rendered by the Board of Governors of the Federal Reserve System in *In the Matter of Ghaith R. Pharaon*, No. 91–037–E–I1, 91–037–CMP–I1 (January 31, 1997) (finding that Pharaon participated in violations of the Bank Holding Company Act by the BCCI Group and fining him $37 million), *aff'd sub nom. Pharaon v. Board of Governors of the Fed. Reserve Sys.*, 135 F.3d 148 (D.C.Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 371, 142 L.Ed.2d 307 (1998), and the underlying recommended decision containing findings of fact and conclusions of law issued by an administrative law judge ("ALJ") on April 12, 1996. For the reasons that follow, defendant's motion is granted and plaintiffs' motion is denied because plaintiffs lack standing to bring the RICO claims alleged in this litigation. Absent standing on the RICO claim, this Court declines to exercise its supplemental jurisdiction over the remaining state law claims, which, accordingly, are also dismissed.

## Background

This action stems from Pharaon's alleged participation in a complex scheme through which the BCCI Group, using Pharaon as an undisclosed "nominee," secretly acquired control of Independence Bank, a medium-sized California lender. As part of this alleged scheme, Pharaon and the BCCI Group's prior management obtained deposit insurance for deposits at Independence Bank from the Federal Deposit Insurance Corporation ("FDIC") through fraudulent means. The scheme also entailed the creation of Baldwin Holdings S.A., a Panamanian corporation, to acquire problem real estate assets from Independence Bank and thus allow the bank to continue to perpetrate the alleged fraud. Defendant and the BCCI Group's prior management also allegedly agreed that the BCCI Group would fund Baldwin Holding's acquisition of these assets through a $17.9 million loan which defendant is claimed to have personally guaranteed. The loan has not been repaid. In 1992, Independence Bank was placed in receivership by the FDIC, which has paid approximately $100 million in insured deposit claims as a result of the bank's failure. The FDIC has also filed claims in the worldwide BCCI Group liquidations for over $114 million.

In a September 1991 Notice of Assessment, the Board of Governors of the Federal Reserve System charged defendant with participating—along with BCCI—in the fraudulent acquisition of Independence Bank in violation of section 3(a) of the Bank Holding Company Act, which makes it unlawful for a company to become a bank holding company without the Board of Governors' approval. 12 U.S.C. § 1842(a)(1) (1994). The Notice also charged that during the period in which the BCCI Group controlled Independence Bank, the BCCI Group—in the annual reports it was required to submit to the Board of Governors as a foreign bank, *see*

*id.* § 3106(a)—concealed its control of Independence in violation of section 5(c) of the Act. *Id.* § 1844(c). The Notice charged Pharaon pursuant to the Act's individual liability provision, section 8(b), 12 U.S.C. § 1847(b), and proposed a $37 million civil penalty.

Following a hearing, the ALJ, on April 12, 1996, issued a recommended decision in favor of the Board. The Board adopted the ALJ's recommended decision on January 31, 1997, and the United States Court of Appeals for the District of Columbia Circuit affirmed that determination. *Pharaon v. Board of Governors of the Fed. Reserve Sys.*, 135 F.3d 148 (D.C.Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 371, 142 L.Ed.2d 307 (1998).

Plaintiffs' court appointed fiduciaries filed this action on April 26, 1994, alleging RICO violations (Counts I—IV) and common law fraud (Count V), and bringing a claim for collection on the personal guaranty allegedly executed by defendant in favor of BCCI Overseas (Count VI). All of these claims for relief concern the same events that were the focus of the Board of Governors' action against defendant. In addition, the court appointed fiduciaries have already pled guilty on behalf of the BCCI Group to criminal RICO violations, including the same alleged racketeering acts that form the basis of the complaint in this case. These motions followed.

## I. Defendant's Motion for Judgment on the Pleadings

### A. *The allegations in the complaint*

The scheme alleged in the complaint is as follows:

During the early and mid–1980's, the BCCI Group's founder and Chairman, Agha Hasan Abedi, and its Vice President, Swaleh Naqvi, sought to acquire a bank in the United States. Believing, however, that the BCCI Group could not obtain approval from the Board of Governors of the Federal Reserve System to purchase a bank in its own name,[1] the BCCI Group decided to use a nominee—Pharaon—"to circumvent regulatory requirements." (Compl.¶¶ 26–29).

In November 1994, BCCI Group employees provided a letter of intent to Independence Bank confirming the willingness of an unnamed purchaser to acquire all of the bank's shares for a price not to exceed $23 million. BCCI Group's employees always refused to identify the purchaser. (Compl.¶ 28).

At around the same time—allegedly in an effort to lend the appearance of legality to the relationship between defendant and the BCCI Group—Naqvi and Pharaon signed an "Investment Advisory Agreement" and had it back-dated to August 1, 1984. This agreement provided that in return for advice with respect to the acquisition of a United States bank, Pharaon would pay BCCI S.A. an annual fee of $25,000 and a fee of 1 percent of the purchase price of a bank. The complaint alleges, however, that no payments were ever made pursuant to the agreement. (Compl.¶ 29).

Between November 30, 1984 and April 30, 1985, BCCI Group officers and employees negotiated the terms of the sale of Independence Bank with representatives of the bank's owner. During that period, BCCI Group officers and employees always led Independence Bank to believe that Pharaon was the proposed purchaser. U.S. counsel—purporting to represent Pharaon with respect to the Independence Bank acquisition—allegedly communicated solely with BCCI Group officers and employees, and obtained all information pro-

---

**1.** According to plaintiffs, regulatory approval for such a purchase by the BCCI Group was impossible, "because the consolidated BCCI organization worldwide was not subject to supervision by a single regulatory body, because the BCCI Group had no lender of last resort and because the BCCI Group could not meet the regulatory, disclosure, financial and managerial standards, and other requirements of relevant U.S. banking laws." (Compl.¶ 26).

vided to U.S. regulatory authorities from the BCCI Group. (Compl.¶ 30).

On April 30, 1985, Pharaon executed a "Stock Purchase Agreement" with the owner of Independence Bank, pursuant to which Pharaon agreed to pay $23 million for all voting shares of Independence Bank. (Compl.¶ 31). The Stock Purchase Agreement also provided that Pharaon would place a good faith deposit of 10 percent of the purchase price—$2.3 million—in an escrow account with a bank in Geneva. The BCCI Group, however, as it would with all payments toward the purchase of Independence Bank, provided the funds for this deposit via a June 24, 1995 wire transfer from BCCI Overseas Grand Cayman, through the State and City of New York, to the account of Banque de Commerce et Placements Luxembourg with First Chicago National Bank, New York. (Compl.¶ 36).

In May 1985, ICIC Overseas, operating at the direction of Abedi and Naqvi, entered into a "Nominee Agreement" in which Pharaon agreed to act as a nominee for ICIC Overseas in the Independence Bank acquisition. Naqvi signed the agreement on behalf of ICIC Overseas. This agreement provided, in relevant part, that:

(a) Pharaon and ICIC Overseas would acquire 100 percent of the voting shares of Independence Bank, and all of the shares of Independence Bank would be transferred to and held in the name of Pharaon;

(b) Only 15 percent of the shares would be held by Pharaon as the beneficial owner thereof;

(c) For the balance of 85% of the shares, Pharaon agreed to give ICIC Overseas or its nominee the right to purchase the shares at the cost price;

(d) Until the purchase was effected and the shares transferred to ICIC Overseas or its nominee, Pharaon would hold the 85 percent block of shares in a fiduciary capacity for ICIC Overseas; and

(e) ICIC Overseas would provide the funds or obtain financing for 85 percent of the purchase price, and Pharaon would have no liability for principal, interest, or the costs of such financing. (Compl.¶ 32). Neither Pharaon nor the former management of the BCCI Group ever disclosed the existence of this agreement to federal or state regulators, in violation of U.S. law. (*Id.*).

Moreover, despite the fact that the BCCI Group was funding all aspects of the Independence Bank purchase, it is alleged that Pharaon and the former managers at the BCCI Group repeatedly led California banking authorities and the FDIC to believe that Pharaon was the sole purchaser of Independence Bank. (Compl.¶¶ 33–35, 37–42).

Specifically, plaintiffs allege that in a proposed acquisition of control notice ("CBC Notice") that Pharaon filed with the FDIC on June 10, 1985, Pharaon made false statements and material omissions which (1) suggested that Pharaon was the sole purchaser of Independence Bank, (2) failed to disclose the existence of the Nominee Agreement, and (3) failed to disclose ICIC Oversea's commitment to arrange financing for the acquisition and its agreement that Pharaon would not be liable for repayment of the loan. (Compl.¶ 34).

The complaint also alleges that on June 11, 1985, Pharaon met with California State Banking Department representatives in Los Angeles and again failed to disclose (1) that the BCCI Group would be providing financing for the purchase, (2) the existence of his agreement with ICIC Overseas, and (3) the existence of the Nominee Agreement. Moreover, in documents provided to the California State Banking Department, Pharaon represented that he would pay $8.4 million of the purchase price from his own funds without financing, and that he would obtain a loan for the major portion of the purchase price from the First National Bank of Boston ("FNBB"). These statements were allegedly false in that Pharaon did not intend to

pay the $8.4 million from his own funds, nor did he intend that FNBB would provide the ultimate financing. Instead, the BCCI Group was to provide the financing for the acquisition. (Compl.¶ 37).

To effectuate the scheme to deceive the federal and state bank regulators, in late August 1985, BCCI SA Bahrain disbursed a purported loan to Pharaon for $8.5 million, and transferred the proceeds by wire (through New York City) to the account of Banque Arabe et Internationale d'Investissement ("BAII") with Morgan Guaranty Trust in New York. BCCI S.A. London sent a telex to BAII instructing it to hold Pharaon's purported deposit of $8.5 million for the purchase of Independence Bank and to issue a false confirmation by telex to the FDIC and to California banking authorities that Pharaon had deposits in that amount with BAII that were being held on Pharaon's behalf for the purchase of Independence Bank. As instructed, BAII sent the telex on September 4, 1985, care of Pharaon's purported U.S. counsel, to the California State Banking Department. Pharaon's purported U.S. counsel delivered the telex, along with a cover letter, to the California State Banking Department the next day. (Compl.¶¶ 38–41).

Based on the information provided to the FDIC in the CBC Notice, the FDIC advised Pharaon's purported counsel by letter dated September 12, 1985 that it would not disapprove of the acquisition. (Compl.¶ 42).

Approximately two weeks later, on September 30, 1985, FNBB and Pharaon entered in a loan agreement whereby FNBB would loan Pharaon $12.6 million ostensibly for Pharaon to finance part of the Independence Bank purchase price. The loan was secured by 100 percent of Independence's stock, but FNBB also insisted on a $5 million letter of credit as additional security. A BCCI Group officer, claiming to represent Pharaon, offered to provide the letter of credit, but FNBB refused. Instead, FNBB agreed to accept a letter of credit issued by BAII, which BAII agreed

to provide, but only after BCCI S.A. provided security in the form of a counter-guaranty, pursuant to which BCCI S.A. agreed to hold BAII harmless against any claim that might arise under the letter of credit. BCCI S.A. London sent a telex to BAII to inform BAII that it had issued the guaranty. In so doing, BCCI S.A. London also transmitted the text of a separate telex describing the terms of the guaranty, and instructed BAII to send the second telex to lawyers for FNBB in Boston and to a BCCI Group employee, who would then pass it along to lawyers purporting to represent Pharaon. (Compl.¶ 43–45).

On October 1, 1985, BAII issued the $5 million standby letter of credit in favor of FNBB, which effectively secured the FNBB loan to Pharaon. (Compl.¶ 46). On that same date, all voting shares of Independence Bank were transferred to defendant, and FNBB transferred funds by wire in interstate commerce to a variety of U.S. banks. (Compl.¶ 48–49).

The $12.6 million loan from FNBB to Pharaon had an eight-year term, and no principal payments were due on the loan until March 31, 1989. In July 1986, however, BCCI Overseas refinanced the loan and paid FNBB in full. When FNBB released the shares of Independence Bank which it had been holding as collateral on its loan to Pharaon, BCCI Group representatives arranged for the shares to be sent to BCCI S.A.'s London office. BCCI Group's "loan" to Pharaon to finance the Independence Bank acquisition has not been repaid. (Compl.¶¶ 52–54).

Following the acquisition of Independence Bank, plaintiffs allege that defendant continued to conspire with Abedi and Naqvi to maintain BCCI Group's secret ownership and control of Independence Bank. (Compl.¶ 55).

The complaint also details Pharaon's incorporation and ownership of Baldwin Holdings, a Panamanian holding company which owns 100 percent of BAF Properties, Inc., which, in turn, owns 100 percent

of PWR Properties, Inc. Plaintiffs allege that when, in 1990, the FDIC became concerned about Independence Bank's involvement in real estate ventures, Pharaon and BCCI Group agreed to use Baldwin Holdings and its subsidiaries to remove problem real estate assets from Independence Bank's books and thereby prevent regulatory scrutiny. They also agreed to fund the acquisition of these assets via a $17.9 million loan from BCCI Overseas to Baldwin Holdings. Pharaon executed a personal guaranty in favor of BCCI Overseas promising full repayment of the Baldwin Holdings loan. (Compl.¶¶ 56–59). According to plaintiffs, "[w]ithout the infusion of cash from BCCI Overseas, through Baldwin Holdings, Independence Bank could have been denied insurance from the FDIC, would have been subject to significant regulatory scrutiny, and might have been seized by government regulators." (Compl.¶ 62).

Plaintiffs allege that, at least in part as a consequence of the above scheme, the following resulted: (1) in December 1991, the court appointed fiduciaries of the BCCI Group entered into a plea agreement which provided for, among other things, the "forfeiture of all of the BCCI Group's U.S. assets," (Compl.¶ 65); (2) also in December 1991, at the request of the United States Government, the English liquidators of BCCI S.A. made a $5 million payment to be applied to the capital of Independence Bank, (Compl.¶ 66); (3) in January 1992, Independence Bank was closed by the California Superintendent of Banks and the FDIC was named as receiver. In that capacity, the FDIC has paid claims for insured deposits valued at over $100,00,000, (Compl.¶ 67); (4) in December 1992, the FDIC, as Independence Bank's receiver, filed a claim for $114,122,616 in the liquidation of BCCI S.A., (Compl.¶ 68); and (5) in April 1993, the FDIC filed a claim for the same amount in the liquidation of BCCI Holdings. (Compl.¶ 69).

### B. *Discussion*

As set forth above, Pharaon has moved pursuant to Fed.R.Civ.P. 12(c) for judgment on the pleadings. A Rule 12(c) motion for judgment on the pleadings may only be granted "where … judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988). *See also Prentice v. Apfel*, 11 F.Supp.2d 420, 424 (S.D.N.Y. 1998). On Rule 12(c) motions, the Court is compelled to accept as true "all of the well pleaded facts alleged" by the nonmoving party, *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir. 1985), and to draw all reasonable inferences in that party's favor. *See, e.g., Varrone v. Bilotti*, 851 F.Supp. 54, 56 (E.D.N.Y.1993) (citations omitted). "General, conclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995). *See also Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 243 (2d Cir.1997) (internal quotations and citations omitted) (noting that while a pleader " 'enjoys all favorable inferences that have been pleaded, [a Court need] not permit conclusory statements to substitute for minimally sufficient factual allegations' ").

Pharaon raises a host of challenges to plaintiffs' RICO claims. Specifically, he contends: (1) that the BCCI Group lacks standing to pursue RICO claims because the BCCI Group was not the intended target of the alleged scheme to purchase Independence Bank, which was intended to benefit, rather than injure, plaintiffs; (2) that by virtue of the BCCI Group's guilty plea and the admitted involvement of its prior management, plaintiffs are collaterally estopped from claiming they were defrauded by conduct they were aware of, are barred from recovery because they are equally at fault for the wrongdoing, and (because prior management of the BCCI

Group was aware of the wrongdoing as early as 1985) are barred by the applicable statute of limitations from pursuing these claims; and (3) that plaintiffs' RICO claims fail to satisfy the elements of a RICO claim, which requires proof of a pattern of racketeering activity, whereas, here, the scheme had a single goal—the purchase and maintenance of Independence Bank. Because the Court agrees that plaintiffs lack standing, Pharaon's other contentions need not be addressed.

Counts I—IV of plaintiffs' complaint allege civil RICO claims pursuant to 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d) (conspiracy to violate sections 1962(b) and 1962(c)).[2] The federal RICO statute provides that "any person injured in his business or property *by reason of* a violation of [18 U.S.C. § 1962]" has a cause of action for which treble damages may be recoverable. 18 U.S.C. § 1964(c) (emphasis added). To state a valid RICO claim, plaintiff must allege, *inter alia*, the commission of two or more predicate acts constituting a "pattern of racketeering activity." 18 U.S.C. § 1961(5). Here, plaintiffs have alleged twelve separate acts of wire fraud in violation of California and federal banking law as the required predicate acts.

The Supreme Court has interpreted RICO's "by reason of" language to limit standing to plaintiffs whose injuries were both factually and proximately caused by the alleged RICO violation. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 265–70, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532 (1992). As the Second Circuit has recently made clear, however, liability under statutes such as RICO does not "depend on whether there is proximate causation as that term is used at common law." *Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 237 (2d Cir.1996). Instead, the question is whether the plaintiff—even though foreseeably injured— "was ... in the category the statute meant to protect, and was the harm that occurred (again, even if foreseeable), the 'mischief' the statute sought to avoid." *Id.* (citation omitted).

■ In the RICO context, the Second Circuit has repeatedly announced that to have standing, a plaintiff must demonstrate that they were "the intended targets of the RICO violations," and that any alleged RICO injury must have been the "preconceived purpose" of the RICO activities. *In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994) (citing *Sperber v. Boesky*, 849 F.2d 60, 64–65 (2d Cir.1988)). *See also Abrahams v. Young & Rubicam*, 79 F.3d at 238 ("Abraham's failure to establish a RICO claim stems from the fact that he was not the 'target of the racketeering enterprise.' ") (citations omitted). Moreover, courts have repeatedly refused to find standing under RICO where the harm caused to the plaintiff is the result of the exposure of the alleged racketeering activity, rather than from the predicate acts underlying the scheme itself. *See, e.g., Abrahams v. Young & Rubicam*, 79 F.3d at 239 (finding failure to state a claim where plaintiff was injured only "by fallout from the scheme's exposure"); *American Express Co.*, 39 F.3d at 400 (holding that dismissal is proper where "any losses to American Express were caused only because the scheme itself was exposed and thus failed"). *See also In re Teledyne Defense. Contracting Derivative Litig.*, 849 F.Supp. 1369, 1373–74 (C.D.Cal.1993)

---

**2.** Section 1962(b) provides that it is "unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

Section 1962(c) provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity ...."

Finally, section 1962(d) provides that it is "unlawful for any person to conspire to violate" the preceding subsections.

(finding no RICO standing where the "independent decisions of . . . whistle-blowers and the government to initiate and prosecute the violations committed" caused resulting harm to the corporation).

■ Any fair reading of the complaint in this case discloses that Pharaon and the former corrupt managers of BCCI did not have a "preconceived purpose" to cause harm to the BCCI Group. Nor do the allegations in the complaint suggest that the BCCI Group itself was the "intended target of the RICO violations." Rather, the story outlined by the complaint consistently suggests that Pharaon's actions, however misguided and ultimately harmful to the BCCI Group, were undertaken to advance the interests of the BCCI Group in surreptitiously acquiring a U.S. bank despite federal law prohibiting such an acquisition. Banking regulators—not plaintiffs—were targeted and defrauded by the scheme detailed in the complaint. It is equally clear that the harm caused to plaintiff resulted from the exposure, investigation, and prosecution of the scheme by regulatory authorities, rather than from the predicate acts of wire fraud. An examination of the injuries alleged—e.g., the forfeiture of assets, the FDIC's claim for more than $114 million and BCCI's expenditure of over $85 million to acquire Independence Bank—supports this conclusion.

Plaintiffs' conclusory allegation that Pharaon and his associates in the enterprise always "knew that the purpose and effect of the investment scheme was to siphon off capital from the BCCI Group to Pharaon and to place [plaintiffs] at risk of serious criminal and civil liability," (Compl.¶ 93) does not affect the Court's conclusion in this regard. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (instructing that a court need not "accept as true a legal conclusion couched as a factual allegation"); *Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 185 (2d Cir.1998); *Haviland v. J. Aron & Co.,* 796 F.Supp. 95, 97

(S.D.N.Y.), *aff'd,* 986 F.2d 499 (2d Cir. 1992).

Accordingly, the Court finds that plaintiffs lack standing to assert civil RICO claims against Pharaon and Counts I—IV are hereby dismissed.

## II. Plaintiffs' Motion for Summary Judgment on the RICO Claims by Reason of Estoppel

Plaintiffs have moved for partial summary judgment in their favor on their RICO claims by reason of estoppel, based on the alleged preclusive effect of the final decision rendered by the Board of Governors of the Federal Reserve System. That motion requires little discussion in light of this Court's granting of Pharaon's motion for judgment on the pleadings set forth above.

■ As an initial matter, for collateral estoppel to apply, (1) the issue for which preclusion is sought must be identical to one that was actually and necessarily decided in the prior proceeding; and (2) the non-movant must have had a full and fair opportunity to litigate in the prior proceeding. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 331, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). While it is certainly true that the factual allegations in this case are largely identical to those that were presented in the Board's administrative proceedings, it cannot be contended that a finding that Pharaon violated provisions of the Bank Company Holding Act is sufficient to establish that plaintiffs have standing to raise the civil RICO claims asserted here.

■ Plaintiffs appear to assert that the Board's finding that Pharaon's actions resulted in substantial financial loss and other damage to the BCCI Group (*see* Plfs' Mem. in Supp. of Mot. for Partial S.J. of Liability by Reason of Estoppel at 24–25) is tantamount to a finding that plaintiffs have standing to raise their RICO claims. However, such a finding—even if made— was plainly unnecessary to the Board of

Governors' finding that Pharaon violated the Bank Company Holding Act. Accordingly, giving preclusive effect to such a finding would violate the standard articulated by the Supreme Court in *Parklane Hosiery*.

Moreover, the Board of Governors' proceedings against Pharaon actually lend support to the Court's finding that plaintiffs lack standing to advance civil RICO claims. The D.C. Circuit—based on the Board's Notice of Assessment that instituted the agency proceedings—described the scheme as follows:

> [T]he scheme was intended to solve two problems BCCI faced in the mid–1980s: accumulated losses of over a billion dollars and pressure from Luxembourg, BCCI's nominal home country, to find a new country capable of regulating an institution operating in nearly seventy nations. Ownership of Independence would solve the first problem by generating profits for BCCI and the second by laying the groundwork for transferring BCCI's oversight to U.S. banking agencies. Pharaon's participation in the scheme, the Board asserted, allowed BCCI to mask its control of Independence from federal regulators, preventing them from obtaining an accurate view of Independence's true management and resources.

*Pharaon v. Board of Governors of the Federal Reserve Sys.*, 135 F.3d at 151. This statement, which is plainly consistent with the factual findings of both the Board of Governors and the ALJ on this point, can best be read to support this Court's holding that the BCCI Group lacks standing to assert civil RICO claims against Pharaon. The scheme—as characterized in the prior proceedings—cannot be said to have targeted the BCCI Group for harm. Rather, the Board of Governors' and D.C. Circuit's findings make exceedingly clear that the BCCI Group was the intended beneficiary of the Independence Bank acquisition. Accordingly, the prior proceedings will not be given preclusive effect and plaintiffs' civil RICO claims must be dismissed.

### III. State law claims

In light of the above determinations, the Court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. The balance of factors to be considered in determining whether or not to exercise supplemental jurisdiction—judicial economy, convenience and fairness—favor dismissal of the state law claims in this action. *See* 28 U.S.C. § 1367(c)(3); *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (favoring dismissal of state law claims where all federal claims are dismissed in the early stages of litigation); *In re Merrill Lynch Ltd. Partnerships Litig.*, 7 F.Supp.2d 256, 276–77 (S.D.N.Y.1997), *aff'd*, 154 F.3d 56, 61 (2d Cir.1998).

### Conclusion

For the foregoing reasons, defendant's motion for judgment on the pleadings is granted and plaintiffs' motion for partial summary judgment by reason of estoppel is denied. Plaintiffs' civil RICO claims are dismissed with prejudice. The remaining claims, arising under state law, are also dismissed.

SO ORDERED.