Donald M. KAPLAN, Petitioner,

v.

UNITED STATES OFFICE OF THRIFT SUPERVISION, Respondent.

No. 96–1080.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 13, 1996.

Decided Jan. 10, 1997.

Wesley G. Howell, Jr., New York City, argued the cause for petitioner, with whom Edward T. Ferguson, III, and Lawrence J. La Sala were on the briefs.

Elizabeth R. Moore, Assistant Chief Counsel, United States Office of Thrift Supervision, Washington, DC, argued the cause for respondent, with whom Thomas J. Segal, Deputy Chief Counsel, and Richard L. Rennert, Senior Attorney, were on the brief.

James V. Mattingly, Jr., General Counsel, Richard M. Ashton, Associate General Counsel, Katherine H. Wheatley, Assistant General Counsel, Board of Governors of the Federal Reserve System, Ann S. DuRoss, Assistant General Counsel, and Lawrence H. Richmond, Counsel, Federal Deposit Insurance Corporation, and Robert B. Serino, Deputy Chief Counsel, Office of the Comptroller of the Currency, Washington, DC, were on the joint brief of the federal amici curiae.

John J. Gill, III, Newport News, VA, Michael F. Crotty, Arthur W. Leibold, Jr., Frank J. Eisenhart, and Leonard J. Rubin, Washington, DC, were on the joint brief of amici curiae America's Community Bankers, et al.

Before: EDWARDS, Chief Judge, SILBERMAN, Circuit Judge, and BUCKLEY, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Donald Kaplan petitions for review of an Office of Thrift Supervision (OTS) order holding him in violation of his duties as a director of a savings and loan in connection with a vote he cast as a director of the savings and loan's parent. We conclude that OTS' order lacks substantial evidence, and so grant the petition.

### I.

The American Savings & Loan Association (the S&L) is a state-chartered thrift once held by the now-defunct Enstar Group. In early 1990, pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), which required

thrifts to divest themselves of their high-yield corporate debt securities, the S&L sold its junk-bond portfolio to Enstar, which purchased it through a subsidiary. Under FIR-REA, the S&L could sell the portfolio to its holding company, so long as OTS both "approved the transaction" and "at all times" found "acceptable" the collateral securing the note with which the holding company purchased the bonds. 12 U.S.C. § 1831e(e)(2)(F)(i), (3)(A) (1988 & Supp. V 1993). With the approval of OTS, then, Enstar purchased the portfolio with a note secured by the junk bonds themselves as well as by the stock of another Enstar subsidiary, Western Reserve (a life insurance company). The note Enstar used to purchase the junk bonds was not its only debt to the S&L, but it was by far its largest.

On June 8, 1990, the Enstar board of directors convened to discuss a number of topics. Kaplan, formerly chief economist at the Federal Home Loan Bank Board and a member of both the S&L and Enstar boards, participated in the meeting. Although the precise content of that meeting is the subject of some dispute, it is clear that Richard Grassgreen, the Chairman of Enstar, reported on the credit difficulties of Enstar's clothing subsidiary, Enstar Specialty Retail, Inc. (Retail). It seems that Retail had had a somewhat disappointing previous year, and its bank had refused to extend its credit line, leaving it in need of cash with which to finance the upcoming back-to-school and holiday seasons. The board therefore discussed methods by which Enstar could internally finance Retail's credit needs. Grassgreen's idea was to sell off some of the junk-bond portfolio acquired from the S&L and loan the proceeds to Retail. Those bonds, as well as the Western Reserve stock, it will be recalled, were serving as collateral on the S&L's note. It was thus apparent to the board that before it could loan to Retail the proceeds of the sale of some portion of the junk bonds, it needed to pledge additional collateral to the pool. In this context, the Enstar board adopted the following resolution:

> BE IT RESOLVED that, it appearing to be in the best interests of [Enstar] to assure the availability of sufficient collater-

al under the Collateral Pledge Agreement by and between [Enstar] and [the S&L] ... the Chairman of [Enstar] is hereby authorized to pledge 100% of the common stock of [Retail] as additional collateral for the Promissory Note....

The terms of the collateral pledge agreement between the S&L and Enstar were such that Grassgreen's supposed plan to substitute Retail stock for cash in the collateral pool could not (at least, not legally) be effectuated without two critical approvals. First, no asset could be substituted for another in the collateral pool unless its valuation had been approved by OTS. Enstar could pledge Retail stock to the pool, but that pledge would not allow other collateral to be withdrawn under the terms of the agreement until and unless OTS valued that stock. And second, no collateral could be withdrawn from the pool without the S&L's approval. Thus, even if Enstar obtained OTS approval of a valuation of Retail stock, it would still have to get the S&L's approval before withdrawing any particular excess collateral from the pool.

At the board meeting, Kaplan himself pointed out that OTS would have to approve any valuation of Retail's stock prior to its being used to substitute for other collateral that Enstar wished to pull out of the pool. Kaplan did not, however, bring up the requirement of the S&L's approval, nor did he or anyone else tell the full S&L board of what had transpired at the Enstar board meeting. Three of the S&L's six board members (Grassgreen, Kaplan, and the S&L's chairman and chief executive officer, Harris Friedman) sat on both boards and thus knew full well what the Enstar board had discussed. A fourth S&L board member also sat on Enstar's board, and although he missed the June 8 meeting, he presumably had access to the minutes, which reflected the pledge of Retail stock (but not the extent of Grassgreen's plan).

Rather than seeking the approval of OTS and the S&L board, and without informing any of Enstar's or the S&L's outside directors, on June 15, Grassgreen pledged the Retail stock to the collateral pool. Then, on

June 22, Friedman authorized Enstar to withdraw $29 million from the collateral pool. That withdrawal was followed, on August 10 and September 7, by two more withdrawals totaling more than $9 million. Unfortunately for all involved, Retail encountered major problems in late 1990, its stock becoming virtually worthless as collateral for the S&L note. Following a subsequent OTS-supervised debt restructuring between the S&L and Enstar, the S&L calculated that it had lost almost $25 million on the note.

After obtaining settlements from Grassgreen and Friedman, OTS brought an enforcement proceeding against Kaplan, seeking a "cease and desist" order under 12 U.S.C. § 1818(b)(1) (1988 & Supp. V 1993) based on an alleged "unsafe or unsound practice" and a violation of a "law, rule, or regulation." OTS also sought restitution under § 1818(b)(6), which authorizes such an order if the practice or violation resulted in a loss to the savings and loan and the charged party was "unjustly enriched" or acted with a "reckless disregard for the law," and asked that Kaplan be barred from serving on the boards of both a savings and loan and its parent, which is warranted under § 1818(e) upon a determination that the charged party "demonstrate[d] willful or continuing disregard ... for the safety" of the savings and loan. Finally, OTS pursued "second tier" civil monetary penalties on the theory that Kaplan "recklessly engage[d] in an unsafe or unsound practice" or, in the alternative, that his fiduciary breach was "part of a pattern of misconduct." 12 U.S.C. § 1818(i)(2)(B). An administrative law judge (ALJ) recommended that all the charges be dismissed, in part because he concluded that in voting for the resolution, Kaplan "authorized the addition of collateral to the pool and nothing more," and in part because he determined that Kaplan had not caused the loss suffered by the S&L. That responsibility, he thought, rested on the shoulders of those "inside officers and directors whose direct misconduct caused the loss in question."

OTS' acting director disagreed. He found that Kaplan's vote in favor of pledging Retail stock to the collateral pool was a *de facto* ratification of Grassgreen's plan to substitute Retail stock for cash in the collateral pool. That vote, and Kaplan's ensuing failure to inform the S&L board of the events that had taken place at the Enstar board meeting, constituted, in the acting director's view, a breach of Kaplan's fiduciary duty to the S&L, because the plan "subjected [the S&L] to substantial risks that were obvious at the time [it] was considered." The acting director treated that breach as the violation of "a law" under § 1818(b)(1). He further concluded that the risk posed by Kaplan's breach was not just substantial, but also was "abnormal," amounting to an unsafe or unsound practice. These determinations justified an order that Kaplan cease and desist from violating the law and from engaging in unsafe or unsound banking practices. And because he thought Kaplan had acted recklessly, the acting director ordered that he pay $500,000 in restitution to the S&L, *see* 12 U.S.C. § 1818(b)(6), and that he be prohibited from serving simultaneously on the board of a savings and loan and its affiliate without OTS' permission, *see* 12 U.S.C. § 1818(e).[1] As the final sanction, the acting director levied a $183,600 civil monetary fine against Kaplan, predicated on the conclusion that he was reckless in the commission of an unsafe or unsound practice and that his fiduciary breach was part of a pattern of misconduct. This petition for review followed.

## II.

The core of Kaplan's defense and his argument on appeal is his claim that however OTS characterizes his conduct—breach of fiduciary duty or engaging in an unsafe or unsound practice—nothing he did or did not

---

1. As noted, such an order is authorized in § 1818(e) on a finding of willfulness. The acting director also found authority for issuing the prohibition on dual service in what he saw as § 1818(b)(1)'s authorization of orders "intended to correct violations of fiduciary duty and unsafe and unsound practices." As with a number of issues, our disposition makes it unnecessary to decide whether such an order is authorized by

do *caused* harm to the S&L.[2] The actual resolution adopted by the Enstar board, he contends, was not and could not have been utilized by Grassgreen and Friedman to effectuate the scheme, since it only authorized the *addition* of new collateral. The actual pledge of the stock, the sale of the junk bonds, and Friedman's release of the proceeds to Grassgreen, which took place privately before the next S&L board meeting and without OTS approval, were the intervening and unforeseeable causes of the S&L's injury.

OTS argues that although it relies on a negligence standard of care to make out a breach of fiduciary duty, it need not show that Kaplan's actions were the proximate cause of the S&L's injury under § 1818(b). It is sufficient in its view to establish that Kaplan's behavior "significantly facilitated" the collateral substitution and withdrawal, or that there was a "nexus" between the board's vote and the subsequent events. Petitioner counters that a proximate causal connection is surely implied by § 1818(b)(6), which speaks of an institution's losses "resulting from" allegations of wrongdoing. *See* 18 U.S.C. § 1818(b)(6); *see also id.* § 1818(e)(1)(B) ("by reason of"); *id.* § 1818(i)(2)(B)(ii)(II) ("causes"); *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 265–68, 112 S.Ct. 1311, 1316–18, 117 L.Ed.2d 532 (1992). That may well be so, but it may also be true—assuming a breach of fiduciary duty is a violation of a "law" or an unsafe or unsound practice under § 1818(b)(1)—that the bank regulating agencies administering § 1818 are entitled to obtain at least a cease and desist order against a bank director who has breached a fiduciary

duty or standard of care, whether or not harm befalls the financial institution. *See, e.g., ABKCO Music, Inc. v. Harrisongs Music Ltd.*, 722 F.2d 988, 995–96 (2d Cir.1983) (Under New York law, an action for breach of fiduciary duty is "prophylactic" and thus does not require finding of proximate cause.). If, for example, petitioner, as a member of Enstar's board, approved Grassgreen and Friedman's actual scheme as it developed, OTS might legitimately have sought his removal even if Grassgreen and Friedman subsequently had a change of heart and never implemented it.

 Be that as it may, we need not decide this issue because we do not think OTS has established that Kaplan breached *any* standard of care that could be deemed to apply to his behavior. Whether one speaks of a breach of fiduciary duty or an unsafe or unsound practice, the common element that OTS must show is behavior that creates an undue risk to the institution. *See, e.g., Graham v. Allis–Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del.1963); *In re Seidman*, 37 F.3d 911, 928–29 (3d Cir.1994); *see generally* ROBERT C. CLARK, CORPORATE LAW, § 3.4.2, at 129–32 (1986); W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, § 31, at 169–73 (5th ed.1984). Any such risk must of course be reasonably foreseeable. That is not to say that the exact series of events that cause injury or loss to the institution must be perceived or even perceivable, but surely no director can be faulted for approving a management proposal that does not pose an increased risk of some kind to the financial institution.

---

§ 1818(b) or instead requires the more demanding standard spelled out in § 1818(e).

**2.** Kaplan raises a number of other, rather sophisticated, statutory arguments. He contends that Florida law, rather than a supposed federal common law of negligence upon which OTS relies to make out a breach of fiduciary duty, supplies the standard of care against which his conduct should be measured. (Florida purportedly requires a higher showing than just negligence.) He also argues that a breach of fiduciary duty does not fall within the terms of § 1818(b)(1), which requires OTS to find a violation of "a law" (but which, unlike other portions of § 1818, does

not mention "breach of fiduciary duty") prior to issuing a cease and desist order. Kaplan does not dispute, however, that a fiduciary breach can qualify as an unsafe or unsound practice (and thus be actionable under § 1818(b)(1)). He therefore does not explain why, if we were to conclude that Kaplan did breach his fiduciary duty, we would not simply uphold the acting director's order on the theory that such a breach constituted an unsafe or unsound practice (whether or not it violated "a law"). In any event, because we conclude that Kaplan did nothing blameworthy, we do not address these arguments.

The acting director focused entirely on Kaplan's vote in favor of the resolution in the Enstar board meeting and on his failure to inform the members of the S&L board (at least, those who either were not also members of Enstar's board or missed the June 8 meeting) of Grassgreen's plan to substitute Retail stock as collateral so that Enstar could meet Retail's finance needs. The Enstar resolution, as is evident from its terms, only provided that new collateral would be added to that which the S&L already controlled, and the ALJ concluded that Kaplan had voted for nothing more. But the acting director's review of the evidence led him to the conclusion that the Enstar board had approved the entire three-step plan. Kaplan disputes that finding, insisting that the second two stages had only been "discussed" and not "approved," but the acting director's finding is at least supported by substantial evidence, so we must defer to it. Still, it is undisputed that Kaplan himself cautioned at the meeting that any substitution of the original collateral would have to be approved by OTS, which would depend on OTS' valuation of the stock to be substituted.

We therefore do not see how Kaplan's behavior in voting for the resolution, viewed *ex ante,* could be thought to have contributed to any increased risk to the S&L whether or not (which we also doubt), viewed *ex post,* it contributed to the institution's loss. After all, the acting director does not suggest that, even assuming the full plan discussed at the Enstar board meeting was tacitly approved by the board, it was remotely foreseeable that Grassgreen and Friedman (like Kaplan, a former bank regulator) would dishonestly short circuit the required procedures by substituting collateral and withdrawing cash without the approval of either OTS or the S&L board—or, for that matter, the Enstar board.

The acting director makes much—much too much in our view—of the fact that Kaplan referred only to OTS approval at the Enstar board meeting. It is claimed that by so doing, Kaplan implicitly dismissed the independent responsibility of the S&L board to approve the plan, which OTS argues the Board was obligated to do *before* the plan was presented to OTS. But OTS does not contend that Kaplan ever said that he, or others on the S&L board, would or should automatically approve any substitution of collateral that passed muster with OTS. Just because Kaplan expected Friedman to go to OTS first does not mean that Kaplan meant to abdicate his director's responsibility. OTS was deeply involved in the debtor-creditor relationship between Enstar and the S&L: It oversaw the initial sale of the junk bonds by the S&L to Enstar, it approved the terms of the note securing that sale, and it remained obligated to review any proposal that might jeopardize that note. It does not seem unreasonable, therefore, to expect that Friedman would talk to OTS, perhaps informally, *before* he took the matter to the S&L board.

The acting director concluded otherwise, without pointing to any regulation or agreement to that effect; he merely stated that OTS expects "the institution's board of directors to provide an independent review of major transactions" "in the first instance" (apparently for OTS' convenience). That would appear to be a legal conclusion, rather than a factual one, and as such it lacks any support, because that "expectation" was never set forth in any legal form. The pledge agreement is silent on this point; it only authorizes Enstar to substitute collateral "with [the S&L's] written approval," as long as the valuation of the collateral is "acceptable" to OTS. Nor does it seem that either the regulators or the S&L officials were clear in their own minds as to any particular expected sequence.[3] In the absence of evi-

**3.** Frederick Teed, a senior supervisory agent at OTS during 1990, stated that it was his "impression" that the thrift's board would serve as an "initial screen." Laurence Fink, who sat on both Enstar's and the S&L's boards, in response to a question asking whether as a director of the S&L board he would want to pass on a transaction *before* OTS approved it, testified:

Well, I would say I would always be curious to know how OTS would respond, but it would be my responsibility to approve it, whether or not OTS sees it or not. So the answer is, I think, yes.
The testimony of Friedman himself in this regard is also somewhat ambiguous. He stated that "there would be times when you'd go to OTS

dence that something Kaplan did could be seen at the time as actually encouraging Grassgreen and Friedman to bypass the required approvals, his vote for the resolution—or the full plan—simply cannot be characterized as inducing the substitution without approval, much less as recognizing that such an extraordinary event would take place.

■ Regardless of Kaplan's anticipated sequence of approval, the acting director concluded that Kaplan was obliged to inform the non-Enstar directors on the S&L board of the whole plan. Kaplan's silence was thought significant because "[a]bsent notice of the plan, the [S&L] board was unaware that proper *or improper* steps might be underway to implement" the plan. (Emphasis added.) The acting director's opinion is unclear, however, as to when Kaplan was obliged to so inform the S&L board. The first S&L board meeting following the June 8 Enstar meeting was on June 28. Friedman did not broach the substitution plan at that meeting; he had in fact already secretly effected the substitution in the main by authorizing the release of $29 million from the collateral pool so that Grassgreen could inject it into Retail. Nor did Friedman tell the S&L board about the collateral substitution plan in subsequent meetings in July, September, and October. The acting director suggests that Kaplan should have therefore surmised that something was rotten in the state of Denmark, and he should have alerted the S&L board to the "plan" and, presumably, to the supposedly suspicious circumstances. But the acting director does not conclude—nor would it be possible to conclude on this record—that Kaplan had knowledge of Friedman and Grassgreen's shenanigans. As noted, Kaplan maintains that he was perfectly reasonable in waiting for Friedman to raise the issue. The delay did not engender his suspicion because, he contends, per his

observation at the Enstar board meeting, he knew OTS would have to approve the substitution and thus assumed that Friedman was dealing with OTS on the matter, which can take a good deal of time.

We do not understand how the acting director can blame Kaplan for not bringing up the matter at an S&L board meeting before Friedman raised it. (It will be recalled that only two directors of the S&L board were not also members of Enstar's board.) Kaplan had no indication that the subject was necessarily "ripe" for the S&L board's consideration, perhaps because Grassgreen and Friedman had decided not to proceed with the plan, or perhaps because Friedman was discussing the matter with OTS.[4] The acting director does not indicate how Kaplan could be expected to know when, if ever, Grassgreen and Friedman would attempt to gain approval of the substitution. Kaplan should be thought required to report to the S&L board only if he had grounds to suspect Friedman and Grassgreen's honesty—and the acting director points to no evidence even suggesting as much. Without any basis to suspect Friedman and Grassgreen, Kaplan did nothing wrong in failing to raise the matter.

At bottom, the acting director's decision is based on the conclusion that the plan, as originally presented to the Enstar board, could not possibly benefit the S&L. Only Enstar and Retail would gain, and necessarily at the S&L's expense, because a substitution of Retail's stock for the junk bonds was a substitution of "illiquid and unappraised equity stock of a closely held corporation" for marketable corporate bonds. Moreover, Retail had lost considerable money in the prior year and the first quarter of 1990; the impetus for the plan was a bank's refusal to extend Retail's credit line. Although it was claimed that Retail's problems were solved, that was yet to be conclusively demonstrated.

---

first because there's no sense in getting board approval for something OTS is not going to approve...." But he also testified that "in this case" it would be "the better practice" to go to the S&L board first.

4. It may well be that Grassgreen and Friedman acted as they did without telling *either* board because of Kaplan's expressed caution at the

Enstar board meeting that OTS approval would be necessary. They probably realized that they would have a difficult time getting OTS to accept a valuation of Retail stock that would justify the substitution. Kaplan may have suspected the same, but he could not be expected to be as familiar with Retail's prospects as Grassgreen.

But all of those observations go to Retail's stock value, and even if they constituted grounds for OTS or the S&L board subsequently to refuse to agree to the collateral substitution, one could not be sure as to what would be the situation when an actual proposed substitution was presented. It is more than a little ironic that the whole chain of events was prompted by a congressional judgment that the bonds which OTS now finds so desirably "marketable" (i.e., corporate junk bonds) were too risky for savings and loans to hold. Whether that was a sound legislative judgment or not, it cannot be denied that any bonds carry some risk, which of course is one of the factors in their valuation. And a closely held corporation is not inherently a risky investment relative to junk bonds. That too is only a question of value. In other words, one cannot say as a matter of law or economics that one form of security is *per se* more valuable as collateral than the other.

Nor can it be said that just because Enstar and Retail would benefit from the substitution the S&L would not. After all, Enstar was the S&L's parent and owed the S&L money pursuant to OTS-supervised transactions quite apart from the collateralized promissory note at issue. If Enstar slipped into financial trouble, the S&L's health would perforce be threatened. Presumably in recognition of this relationship, OTS does not bar directors of savings and loans from sitting on the boards of savings and loans' parents.

To be sure, transactions such as the "plan" presented to the Enstar board must be carefully scrutinized when implemented by a subsidiary board to make certain that the substitution does not entail increased risk for the subsidiary, but it is impossible to conclude that, no matter what a fair appraisal of Retail's value would turn out to be, the substitution in this case was necessarily a negative for the S&L. Since Kaplan "knew" that the S&L board and OTS would have to approve the transaction, he had reasonable assurance that an unfair transaction would not take place.

\* \* \*

The acting director's opinion, although based on unreasonable judgments which could be characterized as arbitrary and capricious, is probably better described as lacking substantial evidence—in our view any evidence—that Kaplan should have been suspicious and should have alerted his fellow S&L board members as to his suspicions. Indeed, OTS' position in this case comes perilously close to treating those who serve on the boards of both savings and loans and their parents as absolutely liable in the event that any transaction between the two injures the savings and loan—which is a backhanded way to prohibit such dual service. This will not do as a matter of administrative law. But whatever OTS' object, the acting director, as we read the record, has made Kaplan something of a scapegoat. *See Wachtel v. OTS*, 982 F.2d 581, 586 (D.C.Cir. 1993).

The petition for review is granted, and OTS' order is set aside.