# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 10, 2014          Decided March 7, 2014

No. 12-1416

LAWRENCE DODGE,
PETITIONER

v.

COMPTROLLER OF THE CURRENCY,
RESPONDENT

———

On Petition for Review of an Order of the
Office of the Comptroller of the Currency

———

*Erik M. Andersen* argued the cause for petitioner. On the briefs was *Thomas L. Vincent*.

*Gabriel A. Hindin*, Attorney, Office of the Comptroller of the Currency, argued the cause for respondent. With him on the brief were *Horace G. Sneed* and *Douglas B. Jordan*, Attorneys.

Before: ROGERS, *Circuit Judge*, and WILLIAMS and SENTELLE, *Senior Circuit Judges*.

Opinion for the court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Prior to 2006, the American Sterling Bank, a federally insured savings bank, had received high composite ratings by the Office of Thrift Supervision

("OTS"). By April 2007, however, the OTS had become concerned about the Bank's declining capital reserves. Several transactions reported as capital in the Bank's quarterly financial reports to the OTS over six consecutive reporting periods through June 2008 led to enforcement proceedings. On September 17, 2012, the Comptroller of the Currency found that Lawrence Dodge, as the Chief Executive Officer and a director of the Bank, had engaged in a pattern of willfully misrepresenting the Bank's capital reserves to the OTS and the Bank's board of directors, and he issued orders prohibiting Dodge from participating in the affairs of any federally insured financial institution and assessing a civil penalty of one million dollars. Dodge petitions for review, contending principally that he could not have knowingly violated accounting standards because they were evolving at the time and his later infusions of cash into the Bank render the prohibition and penalty unjustified. For the following reasons, we deny the petition for review.

## I.

The Federal Deposit Insurance Act ("FDI Act") authorizes the entry of a prohibition order barring future "participation . . . in the conduct of the affairs of any insured depository institution" when the appropriate federal banking agency finds that a party affiliated with an insured institution (1) violated "any law or regulation," "engaged or participated in any unsafe or unsound practice," or breached a fiduciary duty; (2) that either causes the bank to "suffer[] or . . . probably suffer financial loss or other damage," prejudices or could prejudice depositors' interests, or gives the party "financial gain or other benefit;" and (3) that "involves personal dishonesty . . . or . . . demonstrates willful or continuing disregard . . . for the safety or soundness of [the bank]." 12 U.S.C. § 1818(e)(1). These three prongs of the prohibition action are known respectively as "misconduct,"

"effects," and "culpability." *See Proffitt v. FDIC*, 200 F.3d 855, 862 (D.C. Cir. 2000). For each prong, any one of multiple alternative grounds can support an adverse finding. An order of prohibition is supportable upon proof of each prong so long as the misconduct creates a "reasonably foreseeable" risk to the financial institution. *Kaplan v. OTS*, 104 F.3d 417, 421 (D.C. Cir. 1997); *see Kim v. OTS*, 40 F.3d 1050, 1054 (9th Cir. 1994). Additionally, a civil monetary penalty (of not more than $25,000 for each day the violation continues) may be entered for violating laws, regulations, or other requirements, "recklessly engag[ing] in an unsafe or unsound practice," or breaching a fiduciary duty, when that action is "part of a pattern of misconduct," or "causes or is likely to cause more than a minimal loss to [the bank]," or "results in pecuniary gain or other benefit to such party." 12 U.S.C. § 1818(i)(2)(B).

The FDI Act authorizes federal officials to take "prompt corrective action" in order "to resolve the problems of insured depository institutions at the least possible long-term loss to the Deposit Insurance Fund." 12 U.S.C. §1831*o*(a)(1). It defines five capital categories for insured banks ranging from "well capitalized" to "critically undercapitalized." *Id.* § 1831*o*(b). The OTS regulations, in turn, require "[e]ach savings association and its affiliates [to] maintain accurate and complete records of all business transactions." 12 C.F.R. § 562.1(b)(1) (recodified as § 162.1(b)(1)).[1] "Such records shall support and be readily

---

[1] Under Title III of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), functions of the OTS related to federal savings associations were transferred to the Comptroller of the Currency, effective July 21, 2011. *See* 12 U.S.C. §§ 5412(b)(2)(B), 5414(a)(2)(B). Upon transfer, the OTS regulations were recodifed. In this opinion we cite the regulations as they were codified during the events at issue, noting the recodified number within parentheses.

reconcilable to any regulatory reports submitted to the OTS and financial reports prepared in accordance with [Generally Accepted Accounting Principles (GAAP)]." *Id.*; *see also id.* § 563.180(a) (recodified as § 163.180(a)). The financial reports must conform to "the GAAP that best reflects the underlying economic substance of the transaction at issue" as well as "safe and sound practices contained in OTS regulations, bulletins, examination handbooks and instructions to regulatory reports." *Id.* § 562.2(b) (recodified as § 162.2(b)). Of relevance here, § 562.2(b) incorporates the guidance for contributing capital contained in Section 110.16 of the OTS Examination Handbook, which provides that savings associations may accept without limit capital contributions in the form of "Cash[,] Cash Equivalents[,] Other high quality, marketable assets provided they are otherwise permissible for the savings association . . . [or] other forms of contributed capital if the association receives prior OTS Regional Director approval." The regulations warn that "[n]o savings association or [affiliated person] shall knowingly . . . [m]ake any written or oral statement to the [OTS] or to an agent . . . of the [OTS] that is false or misleading with respect to any material fact or omits to state a material fact concerning any matter within the jurisdiction of the [OTS]." 12 C.F.R. § 563.180(b)(1) (recodified at § 163.180(b)(1)); *see also* 18 U.S.C. § 1005.

The enforcement proceeding against Dodge involved four transactions reported as contributions to Bank capital that the OTS alleged failed to comply with GAAP or regulatory requirements. By December 2006, the Bank's capital reserves had declined to "adequately capitalized." In response to the OTS's request, the Bank's holding company, American Sterling Corporation, of which Dodge was CEO and an 85% shareholder, adopted a resolution on April 25, 2007, stating that it would "take appropriate steps to assure [the Bank] meets or exceeds the . . . required capital ratios in order to remain well capitalized at

the end of each regulatory financial reporting period." The ALJ found that between April 2007 and May 2008, the holding company and the Bank made four contributions that the Bank reported as capital:

> • California Republican Party ("CRP") Loan Participation. In 2006, the holding company made an unsecured $3 million loan to the CRP using $3 million supplied by Dodge personally. When the CRP failed to repay the loan at maturity on February 9, 2007, the due date was extended to June 30, 2007. Meanwhile, in April, 2007, the holding company contributed a $2 million participation in the CRP loan to the Bank's capital account for the purpose of increasing the Bank's capital levels. When the CRP again failed to pay on June 30, Dodge extended the maturity date several times, to March 17, 2008, at which point the holding company conveyed the note back to Dodge, who paid nothing in exchange and forgave the loan on June 6, 2008. The Bank informed the OTS that it had received a loan participation due in June 2007, but never disclosed the loan's prior or subsequent extensions or its forgiveness. Dodge admitted he caused the Bank's financial reports to the OTS for March 31, 2007, and all subsequent reports through the second quarter of 2008 to reflect the $2 million as capital.

> • Millennium Gate Foundation ("MGF") Loan Purchase. In 2001, Dodge proposed and the Bank's board approved a $400,000 loan to MGF, and Dodge personally guaranteed repayment. When the loan was not repaid, the Bank charged it off in 2004 and Dodge failed to perform on his guarantee. In April 2007, the Bank transferred the charged-off promissory note to its holding company and reported an inter-company

receivable from the holding company for $400,000 in the Bank's capital account, effective March 31, 2007. The Bank recorded $265,000 as added capital from the loan purchase. The MGF loan file contained no documentation supporting a receivable or the holding company's obligation to pay the Bank. A Bank officer informed the OTS that the holding company had purchased a $400,000 charged-off loan from the Bank, resulting in $265,000 being added to capital. The Bank directors understood the Bank would receive the $400,000 in cash, but that did not happen prior to June 30, 2008. Nonetheless, Dodge caused the $265,000 to be included as capital in the Bank's reports to the OTS over the six reporting periods at issue.

• 9800 Muirlands/Inter-Company Receivables. On January 16 and February 12, 2008, a Bank officer, at Dodge's direction, reported $470,000 and $280,000 on the Bank's books as capital contributions from the holding company and corresponding inter-company receivables from the holding company. Both contributions were backdated to December 31, 2007, for the purpose of making the Bank appear "well capitalized," and were reported to the OTS in the Bank's financial reports for the fourth quarter of 2007 and the first quarter of 2008. Dodge told the OTS and senior Bank managers that the total $750,000 was attributed to the holding company's expected sale of a commercial property known as 9800 Muirlands. As of December 31, 2007, there was no executed agreement or note between the holding company and the Bank regarding an obligation to pay the Bank $750,000 upon the sale of 9800 Muirlands. Nor had a contract for the property sale been executed by January 16 or February 12, 2008, when the receivables were reported as capital,

and no sale had occurred by June 2008.

• Mountain View Pipeline Income.  In 2008, the Bank's executive management team, including Dodge, considered a proposal to service mortgage loans owned by Mountain View Capital.  A member of the management team estimated the potential fee income at $706,949.  The management team instructed a Bank employee to report the potential income stream as income on the Bank's books even though the Bank had no written agreement with Mountain View to service the loans.  The "income" was effective May 5, 2008, and backdated to April 30, 2008.  In December 2008, upon learning from Dodge that there was "confusion" whether an agreement with Mountain View existed, and because the income had been reported for the second and third quarters of 2008, the Bank's board of directors decided to hire an outside auditor to determine the proper treatment under GAAP; the auditor concluded the revenue should not have been reported in the Bank's financial reports to the OTS as income.

During the OTS examination beginning June 30, 2008, the OTS ordered the Bank to reverse the first three contributions, totaling $3,015,000.  As a result, and with the addition of other write-downs largely associated with the Bank's heavy portfolio of mortgages, the Bank became "critically undercapitalized" in the summer of 2008.  On August 11 and 13, 2008, Dodge caused approximately $12 million in capital to be infused in the Bank through loans obtained by a holding company subsidiary.  On August 20, 2008, the OTS issued a cease and desist order requiring the Bank to meet increased capital levels by September 12.  Although Dodge obtained an additional $7.5 million from the holding company, the Bank failed to meet the capitalization requirements of the cease and desist order.  On April 17, 2009,

the OTS placed the Bank in receivership.

On June 25, 2010, the OTS issued a Notice of Intention to Prohibit and Notice of Assessment of a Civil Money Penalty ("OTS Notice") against Dodge. Following an evidentiary hearing, an Administrative Law Judge ("ALJ") issued a recommended decision on November 1, 2011. Although concluding that Dodge's actions were not the actual cause of the failure of the Bank, the ALJ found that for approximately fourteen months, or six OTS reporting periods, Dodge committed "serious" violations of regulatory reporting requirements, prohibitions on false banking statements, and the requirement that only "well-capitalized" institutions accept "brokered" deposits, and that as the Bank's CEO and a board member acted knowingly and recklessly in disregarding risks to the Bank. The ALJ recommended that the Comptroller, *see supra* note 1, enter an order of prohibition against Dodge and an order assessing a civil monetary penalty of $1 million, rather than the $2.5 million proposed in the OTS Notice. Dodge filed exceptions. On September 17, 2012, the Comptroller adopted the ALJ's Recommended Decision as "well reasoned and supported by a preponderance of the evidence," Decision at 10 (citing *Steadman v. SEC*, 450 U.S. 91, 104 (1981) (citing the Administrative Procedure Act, 5 U.S.C. § 556(d))), denied Dodge's exceptions, and entered the recommended orders. Dodge petitions for review.

## II.

Dodge seeks dismissal of the Comptroller's decision and orders on the grounds of legal error in relying on later-developed standards in the OTS New Directions Bulletin of 2009 when there were no clear standards at the relevant times, and in applying a "should have known" scienter standard in findings that required a more demanding level of scienter. He also seeks

dismissal because of the "lack of substantial evidence to support *any* finding of likely harm, or culpable *scienter*, or personal gain." Pet'rs Br. at 31. In his view, the analytical errors stemmed from the Comptroller's failure to acknowledge the commitment of the holding company to back the Bank, the comparatively small risk to the Bank and its depositors caused by any accounting mistakes, and his initiation of discussions with an OTS examiner and infusion of more than $17 million into the Bank all of which, he maintains, makes clear his good intentions and his lack of culpability.

The enforcement proceeding reveals the parties' divergent views about relevant events. Dodge sees himself as a victim of overzealous enforcement efforts during a time of changing standards on what qualified as a capital contribution when no financial harm to the Bank in fact occurred and he acted to shore up the Bank's capital reserves, ultimately infusing, he asserts, more money in the Bank from the holding company than was legally required. *See id.* at 30 32. In the absence of explicit objection by the OTS to the three non-cash contributions, he views his intentions as honorable and lawful, but for the delay in replacing the receivables with cash. The Comptroller, on the other hand, views Dodge's manipulation of the Bank's capital accounts to be plainly contrary to established requirements in a way that could have caused financial harm or other damage to the Bank and did compromise the OTS's ability to take prompt corrective action. To the extent Dodge now urges the court to reweigh the evidence, the court's role in reviewing his challenges to the Comptroller's decision and orders is more limited.

The court must affirm the Comptroller's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Proffitt*, 200 F.3d at 860 (quoting 5 U.S.C. § 706(2)(A)). Although the court owes no deference to the Comptroller's interpretation of 12 U.S.C. § 1818 under

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because several agencies administer the provision, *see Proffitt*, 200 F.3d at 863 n.7; *Wachtel v. OTS*, 982 F.2d 581, 585 (D.C. Cir. 1993), and the court therefore "must decide for [itself] the best reading," *Miller v. Clinton*, 687 F.3d 1332, 1342 (D.C. Cir. 2012) (citation omitted), the court will accord the Comptroller's views the weight due from their "power to persuade," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *Cf. MBIA Ins. Corp. v. FDIC*, 708 F.3d 234, 240 (D.C. Cir. 2013) (citation omitted); *Miller*, 687 F.3d at 1342 n.11 (citation omitted). The Comptroller's findings of fact are final if supported by substantial evidence in the record as a whole. *See Proffitt*, 200 F.3d at 860; *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).

We conclude Dodge has failed to show that the stringent statutory requirements for an order of prohibition were not met.

**A.**

The "misconduct" prong of § 1818(e)(1)(A) may be satisfied by a finding of violation of law or regulation, unsafe or unsound practices, or breach of fiduciary duty. Although the Comptroller found that Dodge committed misconduct on all three grounds, it suffices that the court upholds the misconduct finding on the basis that Dodge engaged in unsafe or unsound practices, *id.* § 1818(e)(1)(A)(ii). *See, e.g.*, *Landry v. FDIC*, 204 F.3d 1125, 1138 (D.C. Cir. 2000). An unsafe or unsound practice is "one that posed a 'reasonably foreseeable' 'undue risk to the institution.'" *Id.* (quoting *Kaplan*, 104 F.3d at 421). There was substantial evidence that Dodge's repeated reporting of certain contributions as qualifying capital "threaten[ed] the financial integrity of the [Bank]," *Johnson v. OTS*, 81 F.3d 195, 204 (D.C. Cir. 1996) (citation and internal quotation mark omitted), by making it appear better capitalized than it was and therefore delaying OTS intervention. *See* ALJ Recommended Decision

(Nov. 1, 2011) ("ALJ Rec. Dec.") at 32 33.

Adequate capital provides a "cushion" against potential bank losses. *Nw. Nat'l Bank, Fayetteville, Ark. v. OCC*, 917 F.2d 1111, 1115 (8th Cir. 1990). As this court recounted in *Transohio Savings Bank v. OTS*, 967 F.2d 598, 603 04 (D.C. Cir. 1992), in the wake of the savings and loan crisis, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989), which required "all savings associations" to meet or exceed uniformly applicable minimum capital levels to be established by the OTS. *See* 12 U.S.C. §§ 1464(s)-(t)(1)(A). According to the Conference Report, these new capital requirements would "provide the self-restraint necessary to limit risk-taking by Federally insured savings associations" and "protec[t] the deposit insurance fund by providing a cushion against losses if the institution's condition deteriorates." H.R. CONF. REP. NO. 101-222, at 404 (1989).

Experts within and independent of the OTS testified that Dodge's accounting practices did not conform to GAAP. The OTS offered the testimony of a Bank officer and CPA as an expert in GAAP and regulatory accounting; he testified that the contributions were inconsistent with accounting principles because they were not "cash, cash equivalents, or other high quality, marketable assets" as required under OTS Examination Handbook § 110.16, and he agreed that GAAP prohibited reporting as capital "a receivable evidenced by an unsecured note from a third party." Hearing Tr. at 573 (Mar. 9, 2011). Similarly qualified experts, an OTS senior policy accountant and the Bank's outside auditor hired by the Bank's board of directors, offered opinions to the same effect. *See id.* at 635 36, 658 60 (Patricia Hildebrand); 685 89 (Anthony Coble); *see also* ALJ Rec. Dec. at 23 24. Dodge's own expert witness agreed that the recording of the CRP loan did not comport with regulatory

requirements and "was potentially" a violation of GAAP. Hearing Tr. at 956, 965 (Leonard Lyons). And he agreed that the Bank's failure to settle the 9800 Muirlands receivables before filing its quarterly financial report with the OTS violated GAAP, as did the reporting of unrealized Mountain View income. *See id.* at 963, 965.

Dodge was well aware of the OTS concerns about maintaining adequate Bank capital levels, as the holding company's April 2007 resolution illustrates. Moreover, Dodge conceded before the ALJ that two of the four challenged contributions  the receivables from the 9800 Muirlands property sale that never occurred and the Mountain View fee income as the result of an agreement that was never reached  violated "in various technical ways" either GAAP or regulatory accounting principles at the time they were reported on the Bank's books as capital. *See* Dodge Brief in Support of Proposed Findings of Fact and Conclusions of Law at 6 & n.4 (June 2, 2011). With regard to the CRP loan participation and the MGF receivable, Dodge acknowledged that the contributions eventually fell out of compliance with GAAP and regulatory accounting principles when they were not repaid or received within a reasonable time. *See id.*; *see also* Petr's Br. at 50; Reply Br. at 17. By recording receivables for funds that the holding company had no documented obligation to provide and prematurely recording income from a potential Mountain View agreement, Dodge disregarded the Bank's need to have adequate available capital.[2]

---

[2] Even were the court to consider documents of which Dodge requests the court take judicial notice, the relevant documents do not call into question the conclusion that Dodge's practices were unsafe or unsound. The Treasury Department's Inspector General audit report, which addressed the backdating of capital contributions at other banks, indicates that the OTS

Furthermore, substantial evidence showed that Dodge's conduct in reporting the challenged contributions as capital was intended to and had the effect of misleading regulators about the Bank's capital condition. The Bank's chief financial officer and senior vice president testified that Dodge caused the Bank to record the 9800 Muirlands receivables as capital when he knew that they did not reflect actual capital in the Bank's possession and was warned that the recording of income from anticipated Mountain View fees was "very aggressive" and might be challenged under GAAP. *See* Hearing Tr. at 512 (Group CFO Ron Dearden) (Mar. 9, 2011). Three contributions were backdated to the end of financial reporting periods in order to make the Bank appear well-capitalized. Dodge acknowledged that the $400,000 MGF receivable did not reflect the transfer of cash from the holding company to the Bank until after the OTS ordered the holding company to replace the receivables with cash

disregarded standards in the period leading up to the 2007−08 financial crisis, but it does not suggest that requirements before the crisis allowed the Bank's challenged accounting practices; rather the audit report states that backdating capital contributions "is not in accordance with [GAAP] and allows for misleading financial reporting." OFFICE OF INSPECTOR GENERAL, DEP'T OF TREASURY, OIG-09-037, SAFETY AND SOUNDNESS: OTS INVOLVEMENT WITH BACKDATED CAPITAL CONTRIBUTIONS BY THRIFTS, at 2 (2009). The Financial Accounting Standards Board Emerging Issues Task Force Abstract 85-1, issued in 1985, states that "reporting [a] note as an asset is generally not appropriate, except in very limited circumstances when there is substantial evidence of ability and intent to pay within a reasonably short period of time." Dodge maintains that he believed the challenged contributions at least initially satisfied that standard, and that the New Directions Bulletin imposed a more demanding standard, but neither the MGF nor the 9800 Muirlands receivables were backed by a note or other evidence of the Bank's legal entitlement to the funds reported as Bank capital.

in June 2008. He also acknowledged during the OTS enforcement investigations that the 9800 Muirlands receivables were reported as capital because the Bank needed $750,000 to meet the statutory and regulatory capital requirements. And he withheld material information from the Bank's board and the OTS that hindered their ability to address risks to the Bank's stability. *See* Section II.C, *infra*.

Dodge's conduct thus undermined the Bank's safety and soundness. The misleading quarterly reports over six reporting periods delayed "prompt corrective action" by regulatory officials pursuant to 12 U.S.C. § 1831*o*. Because Dodge caused the Bank to report the challenged contributions as capital, the Bank was able to appear well-capitalized and accept brokered deposits when it otherwise could not have done so, *see* 12 U.S.C. § 1831f(a); the OTS concluded those deposits contributed to the Bank's potential liquidity crisis in August 2008. OTS Regional Director Gary Scott testified that the Bank's practices jeopardized the Bank's safety and soundness, further supporting the Comptroller's conclusion that Dodge's reporting of non-qualifying contributions as capital exposed the Bank to a reasonably foreseeable undue risk of loss and constituted an unsafe or unsound practice.

**B.**

The "effects" prong may be satisfied by a finding that "by reason of" the misconduct, the bank "has suffered or will probably suffer financial loss or other damage; the interests of the insured depository institution's depositors have been or could be prejudiced; or such party has received financial gain or other benefit." 12 U.S.C. § 1818(e)(1)(B). It is satisfied by evidence of either potential or actual loss to the financial institution, and the exact amount of harm need not be proven. *See Pharaon v. Bd. of Governors of the Fed. Reserve Sys.*, 135 F.3d 148, 157 (D.C. Cir. 1998); *Proffitt*, 200 F.3d at 863. Substantial evidence

supports the Comptroller's findings that depositors could be prejudiced and that Dodge derived a financial benefit. 12 U.S.C. § 1818(e)(1)(B)(ii), (iii). We do not rely on the Comptroller's puzzling conclusion that Dodge met § 1818(e)(1)(B)(i) because he "could have caused the [B]ank" financial harm. Decision at 8.

Contrary to Dodge's view, regulators' heightened concern for the Bank and its low capital levels show that the risk of a liquidity crisis in August 2008 could have prejudiced depositors and was not merely hypothetical. The OTS deemed the risk of a liquidity crisis sufficiently serious to have FDIC officials standing by during early August to take the Bank into receivership if the need arose. The Bank's core capital ratio was 1.6% and its risk-based capital level was 3.1%, levels low enough to make it "critically undercapitalized" under OTS regulations. *See* 12 C.F.R. §§ 565.4(b), 565.2. The Bank's outstanding brokered deposits increased its capital obligations, contributing to the risk of a liquidity crisis. Absent the challenged capital contributions the Bank would not have appeared well-capitalized in the months before August 2008, when regulators could have required corrective action. *See* 12 U.S.C. § 1831*o*(a)(2). The potential liquidity crisis could have prejudiced depositors by compromising the Bank's ability to meet its obligations to them.

Dodge fails to show the Comptroller unreasonably rejected his argument that the risk of prejudice was slight because the holding company always had cash on hand to back up the Bank's capital account. The Comptroller noted, contrary to Dodge's assertion, that the ALJ had not ignored his argument, but rather had concluded the holding company funds were not actually available to the Bank. Dodge testified in response to the question why, if the holding company had so much cash, it was not transferred to the Bank's capital account when the OTS

informed the Bank it needed more capital     that the cash was being used for other business purposes and "[w]e felt we needed to keep other credit that we had at the moment." ALJ Rec. Dec. at 40 (quoting Hearing Tr. at 451). The Comptroller reasonably pointed out a "clear inconsistency" in Dodge's position that the holding company's deposits were Bank capital: "If [Dodge] truly regarded the deposits to be capital, he did not need to make the three Non-Cash Capital Contributions." Decision at 11. In the Comptroller's view, "it should be obvious even to someone without much banking experience that deposits in the name of others, a bank liability, cannot be considered cash or a cash equivalent qualifying as bank capital, as asset," *id.,* and no witness testified otherwise. Furthermore, Dodge's infusions of cash into the Bank in August and September 2008 could only mitigate after the fact the risk of a liquidity crisis and prejudice to depositors. To the extent Dodge suggests that at the time the challenged contributions were recorded as capital, rather than in hindsight, harm to the Bank or its depositors was not reasonably foreseeable, the record evidence supports a contrary conclusion. By reporting the challenged contributions as capital, Dodge avoided alerting the OTS examiners that the Bank lacked sufficient capital to survive a potential liquidity crisis, thus delaying any OTS-ordered corrective actions, and (even if it was not his intent) enabled the Bank to accept brokered deposits.

Dodge also maintains that he did not financially benefit from his actions in reporting the challenged contributions as Bank capital because the mere availability of capital to use for other purposes is not a benefit and ultimately he suffered substantial financial loss when he caused the holding company to infuse millions into the bank. But the Comptroller could reasonably conclude that the availability of the cash deposits for use in other business opportunities was a benefit to Dodge: "In effect . . . by contributing ineligible assets to the Bank's capital accounts, [he] absolved himself from the obligation to inject actual capital into

the Bank." Decision at 15. Dodge's gain or benefit is analogous to that upheld in *De la Fuente II v. FDIC*, 332 F.3d 1208, 1223 25 (9th Cir. 2003), where a financial benefit was found to have accrued when De la Fuente substituted inferior collateral for superior collateral on loans and was thereby relieved of having to infuse capital into the bank, allowing him to use funds for his own benefit. The financial losses Dodge cites occurred only after the OTS ordered the Bank to reverse three non-cash contributions and to increase its capital reserves and the Bank was put in receivership; his infusions of cash in August and September 2008 do not eliminate the benefit he received earlier, during the six financial reporting periods. The cases on which Dodge relies are unhelpful to him. In *Wachtel*, 982 F.2d at 583, 586, and *Rapaport v. OTS*, 59 F.3d 212, 216 17 (D.C. Cir. 1995), the issue was proof of "unjust enrichment," a precondition to requiring restitution under 12 U.S.C. § 1818(b) and a more demanding standard than "financial gain or other benefit" under § 1818(e).

## C.

The "culpability" prong may be satisfied by a finding of personal dishonesty or "willful or continuing disregard . . . for the safety or soundness of" the bank. 12 U.S.C. § 1818(e)(1)(C). The Comptroller found that Dodge's conduct demonstrated dishonesty as well as willful or continuing disregard, and both findings are supported by substantial evidence.

The personal dishonesty element of § 1818(e) is satisfied when a person disguises wrongdoing from the institution's board and regulators, *see Landry*, 204 F.3d at 1139 40, or fails to disclose material information, *see Greenberg v. Bd. of Governors of the Fed. Reserve Sys.*, 968 F.2d 164, 171 (2d. Cir. 1992); *see also Van Dyke v. Bd. of Governors of the Fed. Reserve Sys.*, 876 F.2d 1377, 1379 (8th Cir. 1989). Both the personal dishonesty and willful or continuous disregard elements "require some

showing of scienter." *Landry*, 204 F.3d at 1139 (citing *Kim*, 40 F.3d 1054  55). "[W]illful disregard" is shown by "deliberate conduct which exposed the bank to abnormal risk of loss or harm contrary to prudent banking practices," *Grubb v. FDIC*, 34 F.3d 956, 961 62 (10th Cir. 1994), and "continuing disregard" requires conduct "over a period of time with heedless indifference to the prospective consequences," *id.* at 962 (citations and internal quotation marks omitted).

Dodge challenges the culpability finding for lack of substantial evidence on the grounds that the capital accounting standards were unclear and he reasonably believed the challenged contributions were proper, in part because the OTS did not object.  Substantial evidence supports the finding that Dodge demonstrated personal dishonesty by withholding material information from the Bank's board of directors and the OTS regarding whether and when the reported capital would result in cash available to the Bank.  Dodge informed the board and the OTS that the CRP loan participation was due in June 2007, but he did not inform either that he had personally extended and ultimately forgiven the loan, rendering it valueless to the Bank.  In early 2008, during his negotiations for the sale of the 9800 Muirlands property, Dodge directed that anticipated proceeds from the sale be reported as capital when he knew there was no contract of sale.  Similarly, Dodge knew no agreement had been reached with Mountain View Capital when the fee income was reported as Bank capital in May 2008, but he kept the Bank's board in the dark about whether an agreement had ever existed for the Bank to refinance those mortgages, responding at the December 2008 board meeting that there was "confusion" over whether there was an agreement and he thought treatment of the Mountain View portfolio was consistent with other "lead" lists.  Dodge also did not update the OTS when the reported contributions failed to produce qualifying capital for the Bank.  Dodge does not dispute that the challenged contributions remained in quarterly financial reports for multiple reporting

periods, even after the CRP loan was extended multiple times or the two anticipated agreements failed to materialize. His failure to disclose material information misled the Bank's board and the OTS and suffices to show personal dishonesty.

The lack of clarity in accounting standards that Dodge claimed existed in 2007 and 2008 has no bearing on his culpability for the failure to make these disclosures to the Bank board or the OTS. Similarly, the OTS's lack of objection to Dodge's reporting of the CRP loan participation or the MGF receivable as capital does not undermine the substantial evidence supporting the finding of personal dishonesty. There is no evidence that the OTS expressly approved of the challenged contributions, and because Dodge kept the OTS in the dark about the CRP loan's extension and ultimate forgiveness, even assuming tacit approval by the OTS would suffice, it would not have been fully informed.

Given the record evidence that Dodge directed the Bank to report contributions as capital that were unlikely to produce cash for the Bank, knowing that the OTS would have no reason to doubt that the Bank was well-capitalized and take corrective action, the Comptroller properly found that Dodge knowingly exposed the Bank and its depositors to substantial risk, demonstrating "willful" disregard for the Bank's safety and soundness. *See De La Fuente II*, 332 F.3d at 1223 24. That he did so on multiple occasions over six reporting periods, at times in the face of disagreement by other board members, demonstrates "continuing disregard" as well. The Comptroller recognized that Dodge's manipulation of the capital account "knowingly disregard[ed] the risk that the amount of legitimate or qualifying capital might be insufficient to meet the considerable losses the Bank was experiencing." Decision at 16. Dodge's argument that "he stood behind his commitment to [the Bank] not just for the $3.1 million in challenged transactions, but for millions more[,] misses the point . . . [that he] failed to

reverse the non-qualifying contributions to capital until ordered to do so by the OTS on July 24, 2008." *Id.* (citation and internal quotation marks omitted). His prior inaction amounted to a willful or continuing disregard for the capital reserves required to ensure the Bank's financial soundness. *See id.*

Dodge's objection that the Comptroller and the ALJ erred as a matter of law in applying a "should have known" or negligence standard in making culpability and certain misconduct findings fares no better. The ALJ based the finding of personal dishonesty on Dodge's withholding of material information from the Bank board and the OTS. He also found that Dodge had knowingly ignored risks over multiple reporting periods, "demonstrat[ing] a continuing and willful disregard for the safety and soundness of [the Bank]." ALJ Rec. Dec. at 42 43. To the extent the ALJ and Comptroller stated that Dodge "should have known" of risks or accounting standards, they were analyzing elements that do not require heightened scienter, such as the conceded violation of regulatory reporting standards, the breach of fiduciary duty, or the probability of loss to the bank or depositors. *See id.* at 30, 34; Decision at 11. When finding that Dodge demonstrated personal dishonesty or acted with willful or continuing disregard for risks, both found the required scienter. *See* Decision at 16; ALJ Rec. Dec. at 41 43.

## III.

The requirements to impose a second-tier civil monetary penalty are similar to the criteria for an order of prohibition. The only new misconduct element under 12 U.S.C. § 1818(i)(2)(B) requires evidence of "reckless" engagement in unsafe or unsound practices. The Comptroller may satisfy the effects prong on any of the following grounds: that the misconduct was "part of a pattern of misconduct," that it "causes or is likely to cause more than a minimal loss" to the Bank, or that it "results in pecuniary gain or other benefit." 12 U.S.C. § 1818(i)(2)(B)(ii). The court

will not overturn a civil monetary penalty unless it is either "unwarranted in law or . . . without justification in fact." *Pharaon*, 135 F.3d at 155 (citation omitted) (ellipsis in original). Dodge's challenges to the civil monetary penalty largely repeat his objections to the order of prohibition and fail to show grounds for reversal of the penalty.

The Comptroller noted that all three elements of the misconduct prong of § 1818(i)(2)(B) had been established, even though it was only necessary to establish one, and that the effects prong was also established, including a pattern of misconduct sufficient to warrant the second tier penalty. *See* Decision at 17. Nonetheless, the Comptroller concluded, given the mitigating factors found by the ALJ (Dodge's "lack of previous violations, his prompt replacement of the disputed contributions in the capital account with cash, his infusion of new capital, his cooperation with OTS's efforts to sell the Bank"), that the recommended $1 million penalty, rather than the $2.5 million requested by the OTS, was supported by the record. *Id.* at 18.

There was substantial evidence supporting the findings that Dodge acted recklessly, for the same reasons his conduct demonstrated willful or continuing disregard under the culpability prong of § 1818(e); that his pecuniary gain was shown by the opportunity to use money unencumbered by the Bank; and that Dodge's repeated reporting, over multiple OTS reporting periods, of receivables to which the Bank had no legal entitlement or which were otherwise inadequate as Bank capital shows a pattern of misconduct. In view of the court's deferential review of sanctions imposed by an implementing agency for statutory or regulatory violations, *see Pharaon*, 135 F.3d at 155, we are unpersuaded, for the reasons addressed in Part II, by Dodge's contentions that the Comptroller's civil penalty was "unwarranted in law or . . . without justification in fact," *id.*

Accordingly, we deny the petition for review.